926 P.2d 468

STATE of Arizona, Appellee/Cross–Appellant,

v.

Gregory Scott DICKENS, Appellant/Cross-Appellee.

No. CR–93–0543–AP.

Supreme Court of Arizona, En Banc.

Oct. 31, 1996.

4

Grant Woods, Attorney General by Paul J. McMurdie, Joseph T. Maziarz, Phoenix, for State.

Law Offices of Dennis C. Jones by Dennis C. Jones, Phoenix, and Boyte & Sligh by Mary Katherine Boyte, Yuma, for Defendant.

## OPINION

FELDMAN, Chief Justice.

### JURISDICTION

Gregory Scott Dickens (Defendant) was convicted of two counts of felony murder, one count of conspiracy to commit armed robbery, and two counts of armed robbery. He was sentenced to death on each of the felony murder convictions. Direct appeal to this court is automatic. A.R.S. § 13–4031; Ariz. R.Crim.P. 26.15, 31.2(b). We have jurisdiction pursuant to Arizona Constitution art. 6, § 5(3) and A.R.S. §§ 13–4031 and 13–4033.

### FACTS AND PROCEDURAL HISTORY

Defendant first met fourteen-year-old Travis Amaral in 1990, while working as a counselor at a placement center for violent juveniles in Temecula, California. Defendant maintained a friendship with Amaral in California. In early September 1991, a few days after Defendant moved to Yuma, Amaral contacted him and told him he was running away from home. Defendant purchased a bus ticket for Amaral to travel to Yuma.

According to Amaral's testimony at trial, on September 10, while discussing their financial problems at a restaurant, Defendant suggested they plan a robbery. They flipped a coin to decide who would conduct the first robbery, and Amaral won. Defendant gave Amaral a choice of three locations to commit the robbery, and Amaral chose a highway rest area.

After leaving the restaurant, they drove to a rest area on eastbound Interstate 8, east of Yuma. After waiting and watching for approximately three hours, they saw Laura and Bryan Bernstein drive into the parallel westbound rest area. Defendant gave Amaral a loaded .38 caliber revolver and nodded his head, and Amaral walked across the freeway. Amaral also testified that he carried a two-way walkie-talkie that Defendant had given him, and Defendant had one with him in his truck.

Amaral approached the Bernsteins and asked them for the time. Laura responded, "9:17 [p.m.]." Amaral then pointed the gun at Bryan and demanded his wallet, which he surrendered. Amaral then asked Laura for her wallet, but she did not have one. Speaking through the walkie-talkie, Defendant then told Amaral, "No witnesses." Amaral asked, "What?" Defendant replied, "You know what I mean, no witnesses." Amaral responded, "What do you mean by no witnesses? If I kill them, there are no witnesses; If I leave them here, there are witnesses." Defendant replied, "No witnesses." Amaral ordered the Bernsteins to walk past their car and turn around, asked them if they were

ready to die, and shot Laura Bernstein point blank in the head. Laura dropped to the ground, Bryan crouched down over her, and Amaral shot at his head.

While Amaral was with the Bernsteins, Defendant drove across the median to the westbound lanes, where he picked up Amaral. They then drove to the home of Defendant's brother, where Amaral removed cash, traveler's checks, and one credit card from Bryan's wallet, then burned the wallet and its remaining contents.

At approximately 9:40 p.m., a deputy sheriff discovered the Bernsteins. Laura was dead and Bryan, who had been shot in the head, was semiconscious. He told the deputy that he had been threatened with a gun, attacked, and thought he was shot. He died shortly thereafter.

On September 11, the morning following the murders, Amaral unsuccessfully attempted to use Bryan's credit card at a K–Mart. That evening, Defendant rented a room at a Motel 6, where he and Amaral spent the night. Early the next morning, Defendant and Amaral parted company: Defendant drove to Carlsbad, California, and Amaral went back to his mother's home.

They met up again in March 1992, when Amaral moved in with Defendant for one to two weeks in a San Diego apartment. Amaral's mother reported Amaral as a runaway and gave police Defendant's address. Defendant was ultimately arrested by San Diego authorities on charges of sexually abusing Amaral and other boys, and assault with a deadly weapon.[1] During an interview concerning the alleged abuse, Amaral told police that he and Defendant had been involved in a double homicide in Yuma.

Defendant was indicted in April 1992 on two counts of premeditated first-degree murder, two counts of felony first-degree murder, one count of conspiracy to commit first-degree murder, one count of conspiracy to commit armed robbery, and two counts of armed robbery. He was acquitted of premeditated murder and conspiracy to commit murder but convicted of the felony murders and armed robberies of Bryan and Laura, as well as conspiracy to commit armed robbery. Finding no mitigating factors sufficiently substantial to call for leniency, the judge sentenced Defendant to death on the felony murder counts; he further ordered that if the sentences were ever reduced, they would be served consecutively. The judge also sentenced Defendant to fourteen years' imprisonment on the conspiracy and armed robbery convictions, to be served consecutively to the death sentences.

## PRE-TRIAL ISSUES

Defendant's testimony at trial diverged significantly from Amaral's account of the facts. Defendant stated that he and Amaral were at the rest area because his truck had overheated on the highway; without warning, Amaral went into a rage and ran across the interstate; at the rest area on the other side, he robbed and murdered the Bernsteins. Defendant was impeached with inconsistencies from three prior statements to police.

### A. Voluntariness of Defendant's first statement

■ Defendant's first statement was obtained by the police on March 22 while he was hospitalized in San Diego. The detectives received permission from hospital personnel to interview Defendant and before starting, asked Defendant whether he felt capable of giving a statement. Defendant replied affirmatively, telling them he felt in control of his thoughts and understood what he was saying. He also waived his *Miranda* rights, saying he was very eager to talk, even though the detectives told him he would get no benefits for talking.

Defendant told the detectives that he and Amaral were at the rest area because his truck had overheated while driving to Dome Valley. After being parked for fifteen to twenty minutes, Amaral said they could make some money by robbing people. When Defendant refused, Amaral, who had a gun, jumped out of the truck and walked across the freeway. Shortly thereafter, Defendant saw a muzzle flash and heard two shots. He

---

1. This information was not disclosed to the jurors.

then started the truck and turned back toward Yuma, but when he saw Amaral running down the freeway with the gun in his hand, he pulled over and picked him up. When Amaral got in the truck, he said, "I didn't leave any witnesses," and "I'm not sure if I murdered them, but I shot two people." Later that night, Amaral told Defendant exactly what happened at the rest area, saying he knew one of the victims was dead.

Defendant sought to suppress this statement, arguing that it was involuntary because of his medical condition. At the voluntariness hearing, Defendant presented evidence that he had slashed his wrists, lost a significant amount of blood, and undergone surgery on the afternoon prior to making the statement. Defendant argues that by admitting this statement, the judge violated both his right to due process and the privilege against self-incrimination under the Fifth and Fourteenth Amendments and Ariz. Const. art. 2, §§ 4 and 10.

■ The state has the burden of proving voluntariness by a preponderance of the evidence, and courts look to the totality of the circumstances to determine if that burden is met. *State v. Stanley,* 167 Ariz. 519, 523–24, 809 P.2d 944, 948–49, *cert. denied,* 502 U.S. 1014, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991). The record here contains ample evidence that the state carried its burden. Defendant's own witnesses established that his ability to understand, respond, or think clearly was not impaired.[2] Furthermore, there was no police misconduct or overreaching. *State v. Tucker,* 157 Ariz. 433, 445, 759 P.2d 579, 581 (1988).

Defendant's reliance on *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), is misplaced. In that case, the defendant had been shot and was in intensive care when the police interrogated him. During the interview, the defendant was "encumbered by tubes, needles, and breathing apparatus," "depressed almost to the point of coma," in unbearable pain, and was questioned despite his repeated requests that

questioning cease and that he meet with his attorney. *Id.* at 398–99, 98 S.Ct. at 2416–17. Nothing remotely similar occurred here.

■ Defendant also argues that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights. For this proposition, Defendant contends that his response to the detectives indicates incompetence. Defendant was read his rights and asked, "Having in mind an understanding of your rights, do you want to speak with us." Defendant responded, "Yes I *am.*" (Emphasis added.) Notwithstanding Defendant's ostensibly inconsistent response, the record supports a finding that the *Miranda* waiver was voluntary and intelligent. At trial, Defendant testified that he told the officers he understood his *Miranda* rights and that all three of his statements to the police were voluntary.

## B. Defendant's requests for investigative and expert assistance

■ At various stages throughout the trial, Defendant requested, and the judge generally granted, the appointment of investigators and various experts. Pursuant to Ariz. R.Crim.P. 15.2, the state requested that Defendant disclose any written or recorded witness statements produced by the investigation. The judge then conditioned the grant of additional investigative hours on Defendant's compliance with disclosure requirements and informed counsel that he was responsible for showing how the funds were spent.

Defendant now argues that this procedure violated the Due Process and Equal Protection Clauses of the United States and Arizona Constitutions because the judge's comments and procedures chilled his ability and motivation to investigate the case. These claims are meritless.

■ According to A.R.S. § 13–4013(B), "[c]ompensation for such investigators and expert witnesses shall be such amount as the court in its discretion deems reasonable...." Absent an abuse of discretion and substantial prejudice, we will not overturn the trial

---

2. Dr. Sobotka, who testified for the *defense* at the voluntariness hearing, disagreed with the severity of Defendant's initial diagnosis, testifying that

his blood loss was not great. Dr. Sobotka also testified that the transcript of the interview indicates Defendant was not impaired.

judge's ruling on expert appointments. *State v. Gonzales,* 181 Ariz. 502, 511, 892 P.2d 838, 847 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 720, 133 L.Ed.2d 673 (1996). Here, there was no abuse of discretion. The judge granted virtually every request for costs and experts. That the judge required the money to be spent reasonably or that the information be disclosed to the state pursuant to court rules does not amount to prejudice or violate Defendant's due process or equal protection rights. *See State v. Apelt,* 176 Ariz. 369, 374, 861 P.2d 654, 659 (1993) (claim that defendant was tipping his hand by having to request expert assistance not cognizable prejudice), *cert. denied,* 513 U.S. 833, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994).

## C. Defendant's right to a speedy trial

■ Defendant was indicted on April 7 and arraigned on April 13, 1992. According to Rule 8.2(b), his trial should have started by July 12, 1992. However, in May defense counsel filed a motion to suspend the Rule 8 time limits; the trial judge granted counsel's motion, and the Chief Justice approved the judge's findings.

On September 9, the state moved for a continuance, claiming the defense had failed to disclose certain evidence or retain certain pre-approved experts, several out-of-state defense witnesses were eluding interviews and therefore had to be deposed, and Amaral's November 3 trial would interfere with the state's ability to procure Amaral as a witness in Defendant's case. After hearing argument, the judge continued Defendant's trial to January 26, 1993, finding that extraordinary circumstances justified the continuance.

Defendant now argues that his Rule 8 right to a speedy trial was violated, resulting in a loss of due process under the Fourteenth Amendment. Defendant also claims that because the state conceded that Amaral was not a necessary witness, the judge erred in finding that extraordinary circumstances existed.

Under Rule 8.5(b), a judge may grant a continuance "only upon a showing that extraordinary circumstances exist and the delay is indispensable to the interest of jus-

tice. . . ." However, when a defendant fails to raise constitutional claims in objecting to the delay, we will not reverse the judge's ruling absent fundamental error. *See State v. Schaaf,* 169 Ariz. 323, 327, 819 P.2d 909, 913 (1991).

■ We cannot say that the judge abused his discretion in finding that extraordinary circumstances existed pursuant to Rule 8. *Id.* at 328, 819 P.2d at 914. Furthermore, Defendant failed to raise these constitutional claims at trial. Because the continuance does not amount to fundamental error, the claims are precluded. *Id.* Moreover, the record shows no prejudice resulted from the continuance. *See id.* at 327, 819 P.2d at 913; *State v. Harding,* 141 Ariz. 492, 495, 687 P.2d 1247, 1250 (1984). Accordingly, we find no error.

## D. Trial judge's refusal to excuse juror for cause

■ During voir dire, prospective jurors were asked if they, or any of their family members or close friends, had been involved with crimes similar to the crimes charged. Mr. S answered that he had a close friend who killed four people and indicated that it would be hard for him to acquit someone that he thought was guilty. The judge then asked:

> [C]ould you lay aside that experience and decide this case, understanding that each case has its own different set of facts, decide this case solely on the facts that come in this case during the course of the trial of this case and upon the law the court will instruct you without regard to that incident involving your friend?

Mr. S replied, "Yes." Later, the judge and counsel questioned Mr. S in chambers, and defense counsel asked Mr. S if he might put pressure on himself to find Defendant guilty due to his past experience. He replied, "I'm not sure . . . I couldn't say one hundred percent that it would or would not." The prosecutor then asked Mr. S if he could put aside those opinions and listen to the instructions and the evidence in Defendant's case. He replied, "Yes."

Defendant moved to excuse Mr. S for cause, but the judge denied the motion. Defense counsel subsequently used a peremptory challenge to remove Mr. S. Defendant now claims that in failing to strike Mr. S, the judge denied Defendant his rights to a fair and impartial jury, due process, and full use of peremptory challenges under U.S. Const. Amends. 6 and 14, Ariz. Const. art. 2, §§ 4 and 23, and Rule 18.4. *See State v. Huerta,* 175 Ariz. 262, 263, 855 P.2d 776, 777 (1993); *Wasko v. Frankel,* 116 Ariz. 288, 569 P.2d 230, 232 (1977).

 To prevail on his argument, Defendant must show that Mr. S was biased and could not reasonably render a fair or impartial verdict. *State v. McKinney,* 185 Ariz. 567, 577–78, 917 P.2d 1214, 1224–25 (1996). If a defendant meets this burden and the trial judge erroneously denied the challenge for cause, reversal is required even if the biased juror did not sit on the case. *Huerta,* 175 Ariz. at 264, 855 P.2d at 778.

Defendant has failed to show that Mr. S' responses indicated bias, making him unable to render a fair and impartial verdict. The judge allowed ample examination and concluded that Mr. S could serve impartially. We find no abuse of discretion in the judge's failure to strike Mr. S for cause.

## TRIAL ISSUES

In early September, when all parties believed Amaral would testify against Defendant, the state disclosed all significant information that it had on Amaral. In addition, the judge ordered that Defendant be given transcripts of Amaral's Yuma County juvenile proceedings and his transfer hearing, and reports of his medical and psychological examinations.

Included in the plea agreement Amaral signed on January 15, 1993, less than two weeks before Defendant's trial, was a provision that he would testify at Defendant's trial. Amaral changed his mind a few days later and withdrew from the agreement. Thus, on January 22 the state advised that

Amaral would not be a witness at Defendant's trial. That same day, Amaral's attorney tried to resurrect the plea agreement but was told the deal was no longer open because the prosecutor did not want to alter his trial strategy by including Amaral as a witness against Defendant. Thus, the state proceeded with its case against Defendant on January 26, 1993, without Amaral's testimony. Just prior to resting on February 2, the state asked Amaral's counsel whether Amaral would testify without any terms or stipulations. Amaral's attorney replied that Amaral would not testify without a deal.

After the state rested, defense counsel moved for a judgment of acquittal. The judge heard extensive arguments and decided to take the matter under advisement, telling the parties he wanted to give the motion "due deliberation."[3] Defendant did not object to this delay. Later that day, Amaral, who had kept abreast of the proceedings, met with his attorney. At this meeting, Amaral indicated his willingness to testify because he was upset that Defendant was laying the blame on him. After meeting with Amaral's attorney that evening, the prosecutor revived and Amaral consented to the original plea agreement. Amaral was guaranteed that "in exchange for his truthful testimony" at Defendant's trial, the state would not seek the death penalty.

When the parties met in chambers the next morning, before the judge ruled on Defendant's Rule 20 motion, the state moved to reopen its case so that Amaral could testify. The judge initially denied the state's motion but, on reconsideration, granted it. The judge then ordered a one-week recess to allow Defendant time to take Amaral's deposition and prepare for his testimony.

## A. Delayed ruling on motion for judgment of acquittal

 Defendant argues on appeal that the delay in ruling on his motion for acquittal violated Rule 20 and prejudiced him because hearing Defendant's motion for judgment of acquittal helped the prosecutor restructure

---

3. The judge also cited the parties to *State v. Hill,* 174 Ariz. 313, 848 P.2d 1375 (1993), and asked counsel to look at the facts of that case as they might apply to those of Defendant's case. This appears to be the reason for the delay.

his case on reopening. When a defendant moves for a judgment of acquittal at the close of the state's case, the trial judge's ruling "shall not be reserved, but shall be made with all possible speed." Rule 20(a). A judge's reservation of a ruling on such motion may be reversible error. *State v. Villegas*, 101 Ariz. 465, 467, 420 P.2d 940, 942 (1966). However, the purpose of requiring a prompt ruling on the motion is to ensure that the defendant is not forced into a premature election of resting or going forward with evidence. *Id.* But Defendant was not forced to elect whether to rest or go forward with his case. He had an opportunity to renew his Rule 20 motion after the state called Amaral and before he presented his own case. Because the judge did not force Defendant to go forward with his case or rest, we find no error in the judge's failure to rule on Defendant's Rule 20 motion before recessing or prior to ruling on the state's motion to reopen. Moreover, Defendant failed to object to the judge's decision to reserve his ruling until the following day. *State v. James*, 175 Ariz. 478, 857 P.2d 1332 (App. 1993) (when defendant makes motion at end of state's case, the judge orders arguments be made at a later time, and defense presents its case, defense counsel waives objection to untimeliness if counsel did not object or request a timely ruling when the motion was made).

**B. Propriety of granting the motion to reopen**

■ Defendant argues that the judge erred in granting the motion to reopen because his defense had been structured on the belief that Amaral would not testify. Courts have broad discretion in deciding whether a party may reopen a case to admit evidence. *State v. Walton*, 159 Ariz. 571, 582, 769 P.2d 1017, 1028 (1989), *aff'd*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). In general, a "trial court is not justified in closing the case until all the evidence, offered in good faith and necessary to the ends of justice, has been heard, particularly where the plaintiff seeks to reopen *before the defense has presented any evidence* and where no surprise or prejudice would result therefrom." 75 AM. JUR. *Trial* § 387, at 584 (em-

phasis added); *see also Walton*, 159 Ariz. at 582, 769 P.2d at 1028 (no abuse of discretion if state acts in good faith and reopening does not unfairly prejudice defendant).

**1. Bad faith**

■ Defendant argues that the state acted in bad faith by advising the defense at the beginning of trial that Amaral would not testify and then waiting until the end of trial to offer a deal once the prosecutor decided that Amaral's testimony was needed for a conviction.

Although the trial judge did not explain his determination that there was no bad faith, we do not believe the record supports any inference that the state intentionally misled Defendant. At most, the record indicates that the prosecutor intended to try his case without Amaral's testimony and then changed his mind at the close of the state's case when approached with Amaral's proposal. This certainly hurt Defendant's case, but such damage does not equate to bad faith. *See State v. Caro*, 55 N.M. 176, 228 P.2d 957, 958 (1950). The state gained no unfair tactical advantage when it moved to reopen because the defense had not yet presented any evidence in reliance on the state's case-in-chief. *Cf. State v. Cousins*, 4 Ariz.App. 318, 324, 420 P.2d 185, 191 (1966) (once state rests with knowledge of major variance that forced defense into tactical decision, it is abuse of discretion to allow state to reopen to fix variance). In addition, Defendant was given a one-week recess, ample time to prepare for Amaral's testimony.

**2. Prejudice**

■ Defendant did not suffer unfair prejudice from the judge's ruling. *See, e.g., State v. Cota*, 99 Ariz. 237, 241, 408 P.2d 27, 29 (1965) (legal prejudice results when defendant is deprived of substantial right), *cert. denied*, 383 U.S. 929, 86 S.Ct. 937, 15 L.Ed.2d 848 (1966).

Defendant claims he was surprised with the walkie-talkie story because Amaral had never before made these allegations. However, at deposition during the week's recess, defense counsel did not ask Amaral to de-

scribe the events at the rest area or how the murders occurred. Thus, any surprise may be attributable to this failure. Moreover, there is no prejudicial error when a defendant is given "a full and fair opportunity to rebut the additional evidence." *Id.* at 241, 408 P.2d at 29. Defendant cross-examined Amaral extensively about the walkie-talkies, impeached him with inconsistencies, and was allowed to introduce evidence, over the state's objection, of Amaral's police interview to rebut the inference that Amaral was acting under Defendant's control. If defense counsel was surprised by the additional evidence, it was not because of the judge's ruling on reopening.

Accordingly, we find that the judge did not abuse his discretion in allowing the state to reopen. The purpose of permitting a party to reopen and present further evidence is "to promote justice, not thwart it." *Id.* at 240, 408 P.2d at 28. That purpose was served here, when, because of Amaral's sudden decision to testify and his resulting availability, the jury was given the opportunity to hear the testimony of both Amaral and Defendant, the only living witnesses to the crime.

## C. Amaral's other acts and credibility

Defendant sought to introduce other acts of Amaral to establish an element of his defense under Ariz.R.Evid. 405(b), to show Amaral's motive under Rule 404(b), and to attack Amaral's credibility pursuant to Rule 608. Defendant also wanted to introduce opinion evidence regarding Amaral's personality traits. The judge precluded evidence of Amaral's specific acts but, after Defendant's offer of proof, allowed defense counsel to introduce evidence of Amaral's personality trait for impulsivity because it constituted an element of the defense. *See State v. Christensen,* 129 Ariz. 32, 628 P.2d 580 (1981).

The state argued that if evidence of Amaral's trait for impulsivity was presented, it would seek to introduce evidence of the ho-

mosexual relationship between Amaral and Defendant to explain Defendant's control over Amaral and rebut the defense theory that Amaral acted impulsively and independently.[4] The judge decided that he would rule on the evidence as it was offered.

In light of the judge's ruling, Defendant elected not to present any evidence of Amaral's personality traits, thus avoiding the state's introduction of evidence regarding Defendant's relationship with Amaral. On appeal, Defendant challenges both the judge's exclusion of specific act evidence and the order conditioning admission of character trait opinion evidence on the reciprocal admission of relationship evidence.

### 1. Preclusion of specific acts

Other acts of a *witness* are admissible at the judge's discretion for two reasons. First, the other acts may be used to establish the witness' character, but only if the other acts are probative of truthfulness and if they may be proved without extrinsic evidence. Rule 608; *see also State v. Woods,* 141 Ariz. 446, 449 and n. 1, 687 P.2d 1201, 1205 and n. 1 (1984). Second, evidence of a witness' other acts is admissible if it is relevant for some purpose other than showing that the witness acted in conformity therewith. Thus, evidence of other acts may be used to establish such things as the witness' motive, intent, or plan. Rule 404(b); *see also State v. Jackson,* 186 Ariz. 20, 27, 918 P.2d 1038, 1045 (1996).

 At trial and on appeal, Defendant failed to explain what prior acts he sought to introduce, although his response to the state's motion *in limine* referred to acts "including thefts and robbery." Because Defendant did not provide the judge with a specific offer of proof regarding Amaral's other acts, this court cannot determine the relevance of those acts. In any event, pursuant to Rule 403 the judge specifically found that any probative value of Amaral's other

---

4. There was evidence that Defendant and Amaral engaged in consensual homosexual acts with each other, but there was also evidence that Defendant forced Amaral into sex acts with him and other people. For example, the state had two written, signed contracts marked for identification. One between Defendant and another

male read, "If Shayne D. West gives Greg a total body massage Greg then will buy Shayne the car of his choice for [$]1700." The other, signed by Defendant and Amaral, stated, "I Greg will do or get anything I want if I give him a good german kiss."

acts was substantially outweighed by the likelihood of confusing the jurors and prolonging the trial. On this sparse record, we cannot conclude that the judge abused his discretion.

### 2. Admission of character trait evidence

After the judge said he would rule on evidence of the relationship between Defendant and Amaral as it was offered at trial, Defendant made a tactical decision not to risk admission of the state's evidence. Thus, although the judge ruled that opinion evidence of Amaral's impulsivity would be allowed, Defendant never offered such evidence. Defendant's claims that the rulings interfered with his right to confrontation and to present a defense under the Arizona and United States Constitutions also fail.

 Although a defendant has a fundamental constitutional right to confront witnesses and present a defense, the right is limited to the presentation of matters admissible under ordinary evidentiary rules, including relevance. *State v. Oliver*, 158 Ariz. 22, 30, 760 P.2d 1071, 1079 (1988). Here, Defendant sought to "explore any and all evidence which in the slightest degree affects Mr. Amaral's credibility." Response to Motion in Limine at 8. The right to present a defense is not that broad. Moreover, the judge's ruling did nothing to interfere with Defendant's defense of mere presence. *See State v. Luzanilla*, 176 Ariz. 397, 406, 861 P.2d 682, 691 (App.1993), *aff'd in part*, 179 Ariz. 391, 880 P.2d 611 (1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1406, 131 L.Ed.2d 293 (1995).

### D. Voir dire of potential jurors

 During a weekend recess, juror W was overheard by the judge's son discussing the trial at a bar. Following a hearing, the judge dismissed Mr. W for cause.[5] During closing arguments, it was brought to the judge's attention that juror P told an outside source that his wife had been a juror on a murder case in which a guilty defendant was acquitted on technicality; Mr. P said he did not want to see Defendant get off on a technicality. After a hearing, and prior to excusing the jury for deliberations, the judge designated Mr. P an alternate juror.

On appeal, Defendant claims that Messrs. W and P did not testify truthfully during voir dire about their past experiences or other biases, thereby denying Defendant his right to a fair and impartial jury, due process, and full use of his peremptory challenges under U.S. Const. Amends. 6 and 14 and Ariz. Const. art. 2, §§ 4 and 23. Defendant claims that the bias of these jurors entitles him to a new trial.

We are not persuaded. Because any potential bias of Mr. W or Mr. P was unknown to the parties or the judge during voir dire, the judge did not err in failing to strike them for cause at that time. *See State v. Chaney*, 141 Ariz. 295, 303, 686 P.2d 1265, 1273 (1984).

And when evidence of Mr. W's conduct was brought to the judge's attention, he suspended trial and held a hearing at which he and both counsel questioned Mr. W and the judge's son. By excusing Mr. W for cause, the judge properly averted any bias. *See Rushen v. Spain*, 464 U.S. 114, 128 n. 6, 104 S.Ct. 453, 460 n. 6, 78 L.Ed.2d 267 (1983) (Stevens, J. concurring) ("the meaningful time for a hearing on [juror bias] is ... when doubts about impartiality can be easily remedied by replacing the juror with an alternate."); *Arizona v. Washington*, 434 U.S. 497, 513 n. 31, 98 S.Ct. 824, 834 n. 31, 54 L.Ed.2d 717 (1978) (a biased juror may be replaced with an alternate). Likewise, when information concerning Mr. P's bias came to the judge's attention, he was designated an alternate *at defense counsel's suggestion*. The judge's ruling accorded fully with Rule 18.5(h) (on disqualifying juror, judge may substitute alternate juror). Because the judge acted promptly by ensuring that Messrs. W and P would not participate in deliberations, Defendant was not denied full use of his peremptory strikes.

---

5. During the hearing, Mr. W testified that at the bar, he had only said that his back hurt from the jury bench and that he did not consider himself to be drunk. The judge's son testified that he overheard Mr. W say, "I'm fucked up" and "I am about to convict a murderer."

Defendant's argument that he was denied a fair and impartial jury because the judge erred by denying a challenge for cause also fails. The judge correctly granted the challenge as soon as he became aware of the problem. *Cf. Huerta,* 175 Ariz. at 266, 855 P.2d at 780 (new trial ordered after defendant used peremptory challenge against juror who should have been excused for cause). In this case there has been no erroneous denial of a challenge for cause, and we will not reverse the conviction unless the record shows that the jury was not fair and impartial. *State v. Arnett,* 119 Ariz. 38, 50, 579 P.2d 542, 554 (1978). Here, Defendant does not claim that the alleged biases of Messrs. W and P improperly prejudiced the remaining jurors; nor is there any evidence to support such a contention. *See State v. Vasquez,* 130 Ariz. 103, 634 P.2d 391 (1981) (although juror's non-disclosure improper, defendant must still show prejudice). There was no error or constitutional violation.

## E. Juror misconduct

After the verdict, Defendant moved for a new trial based on juror misconduct. In support of his motion, he submitted affidavits from jurors Magdaleno and Malone. Magdaleno claimed that two jurors who lived or worked near Dome Valley, Defendant's alleged destination on the night of the murders, told the other jurors that there is a well-lit area, Ligurta, off the interstate. Thus it was more probable that Defendant would have pulled over toward Ligurta, rather than the rest area, if his truck had overheated. The jurors also disagreed with testimony regarding the distance between the exit to Dome Valley and the rest area. Magdaleno said that this information, as well as other matters raised during deliberations, persuaded her to change her vote to guilty. Malone claimed that one juror, a mechanic, said Defendant's truck could not have overheated because there was no evidence that the motor was rusty. According to Malone, "This expert opinion was clearly important to a number of jurors."

Malone also indicated that Juror Moreno, who had experience in correctional facilities, told the other jurors that "everyone who is incarcerated lies." Consequently, the jurors disregarded the statements made by inmate witnesses Ausbun and Holder, both of whom testified that Amaral made exculpatory statements about Defendant.

The judge refused to consider these affidavits pertaining to jury room discussions on the grounds that they improperly inquired into the jurors' subjective mental processes and motives. On appeal, Defendant argues that the affidavits showed the jurors considered inadmissible extrinsic information, thus entitling him to a new trial.

### 1. Lord Mansfield's rule

 The general rule, known as Lord Mansfield's rule, is that a juror's testimony is not admissible to impeach the verdict. *See State v. Poland,* 132 Ariz. 269, 282, 645 P.2d 784, 797 (1982); 8 Wigmore, Evidence § 2352(c) (McNaughton rev.1961). Criticisms of strict application of the rule have produced a number of exceptions. In Arizona an exception exists when a juror is guilty of one of six specific types of misconduct enumerated in Rule 24.1(c)(3). *Poland,* 132 Ariz. at 282, 645 P.2d at 797. Relevant to the present case, a judge may consider juror testimony when a juror receives outside evidence not properly admitted during trial. Rule 24.1(c)(3)(i); *see also State v. McLoughlin,* 133 Ariz. 458, 460, 652 P.2d 531, 533 (1982). When such extrinsic evidence is submitted and considered, the defendant is entitled to a new trial unless the judge determines beyond a reasonable doubt that the extrinsic evidence did not affect the verdict. *State v. Glover,* 159 Ariz. 291, 294, 767 P.2d 12, 15 (1988). In making this determination, the judge may not consider "testimony or affidavit . . . which inquires into the subjective motives or mental processes which led a juror to assent or dissent from the verdict." Rule 24.1(d).

 Extrinsic information is information obtained from or provided by an outside source, whether admissible but not admitted at trial or inadmissible for some legal reason. *McLoughlin,* 133 Ariz. at 460–61, 652 P.2d at 532–33; *see also Poland,* 132 Ariz. at 282–83, 645 P.2d at 797–98 (extrinsic evidence consisted of names a juror looked up in her

telephone book and fact that jurors discovered defendant's prior convictions, which had been ruled inadmissible). A juror's common sense and experience, including expertise in particular subjects, is not extrinsic information warranting relief if used during deliberations. *State v. Aguilar*, 169 Ariz. 180, 182, 818 P.2d 165, 167 (App.1991) (medical doctor who disagreed with defendant's expert told fellow jurors so during deliberations); *McLoughlin*, 133 Ariz. at 461 n. 2, 652 P.2d at 534 n. 2.

### 2. The mechanic's opinion

■ Defendant concedes that under *Aguilar* the mechanic's information and opinion about whether Defendant's truck overheated are not considered extrinsic information improperly brought into the jury room. We cannot expect jurors to forget their life experience, accumulated knowledge, or leave behind a lifetime of accumulated views. Like it or not, we acknowledge that jurors will raise such information in their deliberations. *State v. DeMers*, 234 Mont. 273, 762 P.2d 860, 863 (1988). Voir dire, which both counsel and the judge conducted in this case, provided counsel the opportunity to learn whether a potential juror possessed special information or expert knowledge relevant to the case. A challenge for cause or peremptory strike may be used exclude such persons from the jury. We can go no further. We cannot realistically expect jurors to refrain from using the knowledge and experience life has provided them. We therefore decline Defendant's invitation to disapprove *Aguilar*.

### 3. Information about the interstate and the rest area

■ The Dome Valley jurors' information came from their personal knowledge and experience travelling the interstate. Evidence was presented on the distance from the rest area to Dome Valley and the lighting from Ligurta. The basic facts were in evidence, and the jurors simply used the knowledge gained from personal experience to draw inferences from that evidence. Because this additional information came from the jurors' personal knowledge rather than outside sources, it is not extrinsic. 8 Wigmore, Evidence § 2354(b)(2), at 712; *cf. State v. Schackart*, 175 Ariz. 494, 858 P.2d 639 (1993) (newspaper article about defendant's attempt to plead guilty would have been extrinsic), *cert. denied*, 511 U.S. 1046, 114 S.Ct. 1578, 128 L.Ed.2d 220 (1994); *McLoughlin*, 133 Ariz. 458, 652 P.2d 531 (third party's statement to juror that defendant would go free if found guilty by reason of insanity was extrinsic); *Poland*, 132 Ariz. 269, 645 P.2d 784. Thus, the affidavits and testimony of Magdaleno and Malone regarding the jurors' discussion of this information could not be used to impeach the verdict. *See also* Rule 24.1(d).

### 4. Moreno's bias against inmate witnesses

■ Moreno's information indicates his bias against inmate witnesses and raises the question whether a verdict can be impeached by one juror's allegation that another juror was biased. Under these facts, we answer in the negative. Bias, like personal experience, is part of a juror's mind-set. *See United States v. Caro–Quintero*, 769 F.Supp. 1564, 1577 n. 7 (C.D.Cal.1991) (statements by jurors about their own or other's bias not competent evidence to impeach verdict); *State v. Marhal*, 172 Wis.2d 491, 493 N.W.2d 758 (1992) ("a juror's bias or prejudice is not the type of 'extraneous' information or 'outside influence' within the rule's exception to juror testimonial-incompetence because the rule forbids 'an inquiry by the court into a juror's subjective motives for voting' on the verdict") (citations omitted); *see also* Rule 24.1(d) (extrinsic evidence does not include "subjective motives or mental processes which led a juror to assent or dissent from the verdict"); *State v. Callahan*, 119 Ariz. 217, 219, 580 P.2d 355, 357 (App.1978). Courts are forbidden by rule and sound jurisprudential policy from considering the effect of a juror's inherent bias on the jury's subjective deliberative processes. As noted, this problem is cured by voir dire examination and a challenge for cause or peremptory strike.

A defendant may be entitled to a new trial only if a juror conceals facts pertaining to his qualifications or bias on proper inquiry during voir dire. *Wilson v. Wiggins*, 54 Ariz.

240, 243, 94 P.2d 870, 871 (1939). Because Lord Mansfield's doctrine is predicated on misconduct in the jury room itself, a juror's affidavit that pertains to a juror's qualifications would be admissible under that rule to impeach the verdict, if it reveals misconduct outside the jury room. *See Board of Trustees v. McEwen,* 6 Ariz.App. 148, 152, 430 P.2d 727, 731 (1967). Consequently, juror affidavits could be used to prove that one or more of the jurors concealed bias or prejudice on proper voir dire examination. *See People v. Hutchinson,* 71 Cal.2d 342, 78 Cal. Rptr. 196, 455 P.2d 132, *cert. denied,* 396 U.S. 994, 90 S.Ct. 491, 24 L.Ed.2d 457 (1969); *but see Wilson,* 54 Ariz. at 243, 94 P.2d at 871 (when concealment is first discovered in jury room by fellow jurors and obtained solely as a result of deliberation process, one juror's affidavit of another's concealed bias or qualifications is inadmissible to impeach verdict) (*Wilson,* however, was decided before Rule 24.1(d) was adopted); *cf. McEwen,* 6 Ariz. App. at 153, 430 P.2d at 732 (affidavit from the *offending* juror is admissible).

Although the affidavit revealing Moreno's bias could arguably be admitted to show that on voir dire Moreno concealed facts pertaining to his qualifications as a juror, defense counsel did not question Moreno on his potential bias toward inmate witnesses, even though Defendant was aware of Moreno's background in corrections and the inmates were listed as witnesses at the time of voir dire. Moreover, the record reveals that Moreno concealed nothing in the way of facts or bias. In fact, he was quite forthcoming when, at his request, he offered additional information on his corrections background to counsel in chambers. Because his alleged bias surfaced during jury deliberations, and there is no evidence of intentional concealment during voir dire, we find no error in the judge's refusal to grant a mistrial based on juror misconduct. Accordingly, the judge did not err in denying a new trial on grounds of juror misconduct.

## F. Communications between the bailiff and the jury

Before retiring for deliberations, the jurors were instructed that any communication directed to the judge should be communicated through the bailiff. During deliberations, the jury summoned the bailiff due to confusion about the definition of "culpability." The bailiff delivered the written question to the judge, who ultimately provided a written definition of the word after conferring with counsel. While the bailiff was in the jury room responding to that question, another juror asked the bailiff for a clarification of the armed robbery charge. The bailiff told the juror he should discuss his question among the other jurors; if the question could not be resolved, she would take the matter to the judge. The jurors did not request further definitions or clarifications.

Defendant moved for a new trial on the grounds that the bailiff's failure to deliver the juror's question about the armed robbery charge to the judge violated Rule 22.3 and constituted misconduct. After reviewing affidavits from two jurors and holding an evidentiary hearing at which the two jurors and the bailiff testified, the judge denied Defendant's motion.

We find no error. First, the record shows that only one juror asked the bailiff to clarify an instruction, not that the jury presented a question to the judge. Nor did the bailiff refuse to submit a question to the judge or attempt to answer it herself. *Cf. Southern Pac. R.R. Co. v. Mitchell,* 80 Ariz. 50, 64, 292 P.2d 827, 836 (1956). The bailiff merely instructed the juror to discuss any need for clarification with the other jurors and present a question for transmittal to the judge if there was one. Having just asked a question and received an answer on another subject, we must assume that the jurors were well aware of their ability to address questions to the judge. We do not see how the bailiff's statement could be considered interference with the jurors' prerogative to transmit questions to the judge.

Nor are we able to ascertain from the record the substance of the question bothering that one juror. Defendant's reconstruction of the question, even if correct, provides no basis for relief. Defendant believes that the juror's question related to the form of verdict with respect to armed robbery and the specific finding "with or without a deadly

weapon." The verdict form failed to include the language "while the defendant *or* an accomplice was armed with a deadly weapon," although the instruction read and provided to the jury was properly worded. Because of this omission, Defendant contends, the juror may have been confused about how to mark the verdict form to find Defendant guilty of armed robbery because Amaral, not Defendant, was the one armed with a deadly weapon. But no one disputes that Amaral committed armed robbery while using a deadly weapon. Accordingly, any confusion on the verdict form is harmless because the jury found Defendant guilty as an accomplice. Thus it is inconsequential which accomplice was armed.

### G. Admission of gruesome photos and medical examiner's testimony

■ Prior to trial, Defendant filed a motion *in limine* to exclude gruesome photographs of the contact wound on Laura, a picture of Laura's body near her receipt and keys, the X-ray transparency of Laura's head, and the pathologist's testimony. Because Defendant stipulated to the cause and manner of death, he argued that the evidence added nothing to the case and was unduly prejudicial.[6]

■ Even if a defendant does not contest certain issues, photographs are still admissible if relevant because the "burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense." *Estelle v. McGuire*, 502 U.S. 62, 69, 112 S.Ct. 475, 481, 116 L.Ed.2d 385 (1991); *see also State v. Walden*, 183 Ariz. 595, 611, 905 P.2d 974, 990 (1995), *cert. denied*, — U.S. —, 116 S.Ct. 1444, 134 L.Ed.2d 564 (1996). If a photo-

graph is relevant, the court must determine if it is inflammatory and, if so, whether the danger of unfair prejudice substantially outweighs the photograph's probative value. *State v. Amaya–Ruiz*, 166 Ariz. 152, 170, 800 P.2d 1260, 1278 (1990), *cert. denied*, 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991); *see also* Ariz.R.Evid. 403.

Although a stipulation as to facts is relevant to the weighing process, Defendant fails to explain how the pathologist's testimony was prejudicial. *State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983). In any event, the record reveals that neither the testimony nor the photographs were unduly prejudicial or inflammatory, and the judge did not abuse his discretion in admitting them.

### H. Evidence relating to theft of the gun

■ At trial, the state contended that Defendant had stolen the gun used in the murders and robberies from a co-worker, Paige Fluckiger, when Defendant worked at ABM security in California. Defendant sought to exclude evidence relating to the theft. Following a Rule 404(b) hearing, the judge ruled the evidence admissible because its probative value outweighed any prejudicial effect. On appeal, Defendant argues that admission of the evidence violated Rules 403 and 404(b) because it was unduly prejudicial; in addition, he argues there was insufficient evidence of the prior theft to take to a jury. *See State v. Marahrens*, 114 Ariz. 304, 560 P.2d 1211 (1977).

■ We review the admission of other act evidence for abuse of discretion. *State v. Gulbrandson*, 184 Ariz. 46, 60, 906 P.2d 579, 593 (1995), *cert denied*, — U.S. —, 116 S.Ct. 2558, 135 L.Ed.2d 1076 (1996).[7] Other

---

6. Only the transparency was later found in the court file. The state noted that, due to this fact, it was unable to view the photographs and relied on a reading of the transcripts to determine their content. This court has been forced to rely on the same.

7. We analyze the admission of this evidence under Rule 404(b) because both the judge and parties did so. However, the evidence is admissible absent a Rule 404(b) analysis because it is intrinsic evidence. *United States v. Coleman*, 78 F.3d 154, 156 (5th Cir.1996); *United States v. Swin-*

*ton*, 75 F.3d 374, 377 (8th Cir.1996) (Rule 404(b) applies only to extrinsic, not intrinsic, evidence); *United States v. Tutiven*, 40 F.3d 1, 5 (1st Cir. 1994) (Rule 404(b) is only applicable to other acts "whose probative value exclusively depends upon forbidden inference of criminal propensity," not to intrinsic evidence.), *cert. denied*, — U.S. —, 115 S.Ct. 1391, 131 L.Ed.2d 243 (1995). " 'Other act' evidence is 'intrinsic' when evidence of the other act and evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries'

act evidence is not admissible to establish the defendant's bad character but is admissible to prove such things as opportunity, intent, preparation, plan, or knowledge. Rule 404(b); *State v. Perea*, 142 Ariz. 352, 357, 690 P.2d 71, 76 (1984). If relevant for one of these other purposes, the trial judge must determine if the probative value is substantially outweighed by the danger of unfair prejudice. Evidence that Defendant obtained the murder weapon was probative of several of the purposes outlined in Rule 404(b), especially because Defendant claimed that Amaral procured the gun without Defendant's knowledge and that he did not participate in the underlying felonies. *See People v. Billington*, 116 Mich.App. 220, 323 N.W.2d 343, 348 (1982) (prior breaking and entering relevant under Rule 404(b) "to establish defendant's access to the murder weapon, which fact tends to refute his claimed defense that he did not participate in the [subsequent unrelated] shooting and thus had no intent to commit the charged crime.").

Moreover, contrary to Defendant's characterization, there was substantial evidence of the theft, as discussed below. *See Marahrens*, 114 Ariz. at 307, 560 P.2d at 1214; *see also State v. Fierro*, 166 Ariz. 539, 547, 804 P.2d 72, 80 (1990); *State v. Valles*, 162 Ariz. 1, 5, 780 P.2d 1049, 1053 (1989). Finally, the jurors were given an appropriate limiting instruction on the evidence. The judge did not abuse his discretion in admitting this evidence.

## I. Admission of hearsay evidence regarding theft of the gun

 Defendant called Rafael Bruno, also a co-worker at ABM security, to testify. On cross-examination, and over defense objection, the state offered a report of Fluckiger's statement about the theft, including the date the gun was stolen and other information. Over objection, the judge admitted the report as a record of a regularly conducted business activity. In closing, the state argued that the reported date of the theft implicated Defendant as the thief. On appeal, Defendant argues that the report was inadmissible hearsay.

According to Rule 803(6), a record or report of an event is admissible as a record of regularly conducted activity if it is "[m]ade at or near the time of the underlying event" and "made and kept entirely in the course of that regularly conducted business activity." Defendant claims that the report does not qualify because it was dated September 17, 1991, and reported an incident that occurred on July 24, 1991; he therefore argues it was not made "at or near the time of the event." Defendant also claims that the report of an alleged theft is not part of ABM's regularly conducted activity. The record indicates that ABM's custom was to report these types of incidents on an official report form, but the witness could not recall how close in time the report was to the theft.

 Given that the two-month delay in recording information was not shown to be customary—the record was no more than a repetition of Fluckiger's account of the theft—and that the information was not recorded on ABM's official incident report form, we agree that the judge erred in admitting the report as a record of regularly conducted business. However, Fluckiger testified at trial to the approximate date of the theft and that he had shown Defendant, and only Defendant, where the gun was hidden. Other circumstantial evidence established that Defendant had an opportunity to take the gun. The report was thus cumulative to much other evidence. Accordingly, we conclude beyond a reasonable doubt that the judge's error was harmless.

## J. Admission of hearsay evidence and improper insinuation

 In his second statement to police, Defendant told detectives that Amaral made exculpatory statements about Defendant to three friends. During the trial, the state asked Detective Berglund if he was able to obtain information from two of these friends in follow-up investigations. Over defense objection, Berglund was allowed to answer that

to the crime charged." *Coleman*, 78 F.3d at 156, quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir.1990).

he was not. Defendant argues that Berglund's answers were hearsay.

The hearsay objection was properly overruled because Berglund did not relate any out-of-court statements. *See* Rule 801. Rather, he mentioned only the names Defendant provided to police and said he did not obtain any information relevant to the case. Berglund's conduct in following any exculpatory leads was relevant to Defendant's theory that Amaral and the police were making him take the fall for a crime Amaral committed alone. Accordingly, Berglund's description of his activity was not hearsay, but conduct in issue, admissible to establish that the detective followed up on the leads Defendant had provided. *See State v. Rivera,* 139 Ariz. 409, 413–14, 678 P.2d 1373, 1377–78 (1984).

In Defendant's first statement to police he said that immediately following the murders he called his then-girlfriend Laurie. Defendant urged the police to contact her to confirm his version of the story that Amaral acted alone. During closing argument, the state called into question why Laurie did not testify for the defense. Defendant argues that the state's comment in closing was a prejudicial insinuation made without proof. Defendant's argument is both meritless and precluded because Defendant did not object to the alleged improper insinuation. *State v. Gendron,* 168 Ariz. 153, 154, 812 P.2d 626, 627 (1991).

## K. Prosecutorial misconduct

Defendant argues that the prosecutor committed misconduct by: (1) making erroneous statements to the judge regarding Amaral's availability during its case-in-chief; (2) improperly vouching for Amaral before his credibility had been attacked by eliciting on direct examination that the terms of his plea called for truthful testimony; (3) violating *Brady* by not disclosing earlier notes of Amaral's interview in which he first mentions the walkie-talkie; (4) violating *Brady* by not disclosing allegedly exculpatory information provided by Robert Knapp, who was listed as a potential defense witness; (5) intimidation of inmate witness Ausbun by threatening to give Ausbun the maximum term on his own case if he testified; (6) misstating Amaral's plea agreement in closing; and (7) misstating in closing the law regarding felony murder and accomplice liability. Defendant claims that each individual act, as well as their cumulative effect, denied him his constitutional rights to due process and a fair trial. Defendant concedes, and the record reveals, that none of the claims of misconduct except the Knapp *Brady* violation was made at trial. Accordingly, we review all except the alleged *Brady* violation for fundamental error. *State v. West,* 176 Ariz. 432, 444, 862 P.2d 192, 204 (1993), *cert. denied,* 511 U.S. 1063, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1994).

Knapp was listed as a defense witness. After obtaining Knapp's telephone number with the state's assistance, a defense investigator contacted Knapp's foster mother in an unsuccessful attempt to locate Knapp. Later, the prosecutor received a call from Knapp's foster mother complaining about defense investigator. During this conversation, the prosecutor spoke with Knapp, who told him that while in juvenile hall with Amaral in 1992, Amaral bragged about how he and Defendant robbed and killed an elderly couple in Arizona. Because there is no record of this crime, Defendant argues that the statement shows Amaral's untruthful character. Knapp also told the prosecutor Defendant had provided him with drugs and he suspected Defendant had made threatening phone calls about Knapp's potential testimony.

Although defense counsel contacted Knapp's foster mother, they never located Knapp. He was consequently unavailable for trial. Defendant argues that defense counsel could have taken steps to obtain Knapp's testimony if the state had disclosed its contact with Knapp, and that Defendant's motion for a mistrial was erroneously denied on this ground.

We disagree with Defendant and believe that under the circumstances, failing to disclose the Knapp interview did not violate *Brady.* The state reasonably believed that defense counsel had already spoken with Knapp or his foster mother, and the state provided the phone number to defense counsel. Moreover, we fail to see how the prose-

cutor's conversation with Knapp was exculpatory. There is no reasonable probability that Defendant would have been acquitted had the conversation been disclosed. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *State v. Atwood*, 171 Ariz. 576, 606–07, 832 P.2d 593, 623–24 (1992), *cert. denied*, 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993). In fact, defense counsel admitted that, based on Knapp's deposition, which was taken in connection with the new trial motion, Knapp would not have been called to testify. Thus, we find no prosecutorial misconduct in failing to disclose the conversations earlier. *Atwood*, 171 Ariz. at 606, 832 P.2d at 623.

None of Defendant's other claims approaches the level of fundamental error. Defendant's argument that the cumulative effect of the prosecutor's action is reversible error is also incorrect, as this court does not recognize the so-called cumulative error doctrine. *See State v. Roscoe*, 184 Ariz. 484, 487, 910 P.2d 635, 648, *cert. denied*, —— U.S. ——, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996).

**L. Sufficiency of the evidence**

Defendant made two motions for judgment of acquittal: the first before the state was allowed to reopen and call Amaral, and the second after the state rested following Amaral's testimony. The first motion was never ruled on; the second was denied. Defendant also moved for a new trial on the judge's failure to grant these motions, as well as under Rule 24.

Defendant now claims that the judge erred in failing to rule on the first motion for judgment of acquittal because before Amaral testified there was "no substantial evidence to warrant a conviction." *State v. Mathers*, 165 Ariz. 64, 67, 796 P.2d 866, 869 (1990). He claims that the second motion was improperly denied because Amaral lacked credibility and thus could not have added anything to the evidence, and that, even if Amaral was believable, the judge should have granted the motion as to counts 4 and 8 (felony murder and armed robbery of Laura Bernstein) because there was no evidence that Amaral robbed or attempted to rob Laura.

As discussed earlier, the judge did not err in delaying his ruling on Defendant's first motion for judgment of acquittal. The second motion was appropriately denied because credibility determinations are for the jury and reasonable minds could differ on the inferences to be drawn from the evidence. *See State v. Landrigan*, 176 Ariz. 1, 4, 859 P.2d 111, 114, *cert. denied*, 510 U.S. 927, 114 S.Ct. 334, 126 L.Ed.2d 279 (1993). Through his own statements to police, Defendant provided evidence that he knew a robbery would be committed and that Amaral had a gun. Amaral's testimony, which the jury apparently believed, was alone sufficient to support the verdicts. Physical evidence supports the robbery and felony murder of Laura: Amaral took her traveler's checks and the photograph of Laura near her keys and receipts indicates that she may have emptied her pockets prior to death.

**JURY INSTRUCTIONS**

**A. Felony murder**

The judge gave the following felony murder instruction:

> The crime of first degree *felony* murder requires proof of the following two things:
>
> 1. The defendant, or an accomplice as I have defined that term, committed *or attempted* to commit Armed Robbery; and
>
> 2. In the course of and in furtherance of this crime or immediate flight from this crime, the defendant, or an accomplice caused the death of any person.

(Second emphasis added.)

Defendant claims that the court erred in (1) not defining "in furtherance of" for purposes of felony murder; (2) instructing the jury on *attempted* armed robbery as an underlying offense to felony murder because it was not charged in the indictment and was not defined in the instruction; and (3) failing to instruct that a mental state of either conscious indifference or reasonable foreseeability was required as an element of felony murder.

■ Defendant did not object to the instructions at trial. We therefore review for fundamental error. *See West*, 176 Ariz. at 445, 862 P.2d at 205. The instruction mirrors the felony murder statute, A.R.S. § 13–1105(A)(2), and is a correct statement of the law. *See State v. Woratzeck*, 134 Ariz. 452, 455, 657 P.2d 865, 868 (1982). Moreover, Defendant's requested instruction was virtually identical to the one given by the judge and did not define "in furtherance of"; thus any error from this portion of the instruction was invited. *See State v. Diaz*, 168 Ariz. 363, 365, 813 P.2d 728, 730 (1991) (when defendant requests an instruction and later claims fundamental error, any error is "invited error at its worst, and it is waived for appeal purposes."). "In furtherance of" is a common term, and nothing in these facts suggests that the murders were not committed in furtherance of the robberies.

■ Nor could any error in the instruction using the attempt phrase have caused the jury to convict Defendant of a crime not charged in the indictment. The facts make it quite clear that robbery was not only attempted but completed.

■ As to Defendant's third argument, felony murder does not require proof of a *mens rea* other than that for the underlying felony, which was properly explained. *Woratzeck*, 134 Ariz. at 455, 657 P.2d at 868; *State v. Herrera*, 176 Ariz. 21, 30, 859 P.2d 131, 140, *cert. denied*, 510 U.S. 951, 114 S.Ct. 398, 126 L.Ed.2d 346 (1993). Thus, we find no fundamental error.

## B. Conspiracy

■ Defendant was charged with conspiracy to commit murder and conspiracy to commit armed robbery. The court instructed the jury on conspiracy pursuant to Recommended Arizona Jury Instruction 10.038, which states in part:

Before you find that a defendant or any other person was a member of a conspiracy, the evidence must show beyond a reasonable doubt that the conspiracy was knowingly formed and that the defendant or other person claimed to have been a member knowingly participated in the unlawful plan with the intent to promote or assist the carrying out of the conspiracy.

\* \* \* \* \* \*

A person cannot be bound by the acts or statements of other participants until it is established that a conspiracy existed and that person was one of its members.

Defendant requested that several additional jury instructions be given on conspiracy. For example, Defendant requested the following:

The fact that one can be criminally responsible for the crime of conspiracy without committing the planned substantive offenses does not mean that one is also criminally responsible for the substantive offenses without being either an accomplice or principal to those offenses.

The judge rejected the proposed instructions. We find no error. The judge properly instructed the jury on the definitions of the charged offenses, including the definition of an accomplice. The instructions made it clear that the jurors could not convict Defendant unless they determined he was an accomplice to the substantive crimes. *See State v. Pittman*, 118 Ariz. 71, 75, 574 P.2d 1290, 1294 (1978).

## C. Limiting instruction

■ Defendant requested a limiting instruction advising the jury that

a witness who becomes involved as an accessory after the commission of a charged offense by concealing, harboring, and protecting the suspect, is neither a "principal" nor an "accomplice."

The judge denied the requested instruction, finding that the elements contained in the requested instruction were properly covered by the instruction defining an accomplice. We agree. The instruction given adequately defined accomplice liability. *See Schackart*, 175 Ariz. at 503, 858 P.2d at 643.

## D. Lesser included offense instructions

■ Defendant claims that the judge erred in not *sua sponte* providing jury instructions and verdict forms on lesser included offenses to felony murder and accomplice liability. Because Defendant did not request

the lesser included offense instructions at trial, we review only for fundamental error. *See* Rules 21.2, 21.3(c); *State v. Vickers,* 129 Ariz. 506, 512–13, 633 P.2d 315, 321–22 (1981).

█ Defendant concedes that this court has held there are no lesser included offenses to felony murder. *West,* 176 Ariz. at 443, 862 P.2d at 193; *State v. Martinez–Villareal,* 145 Ariz. 441, 702 P.2d 670, *cert. denied,* 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985). He nevertheless requests this court to reconsider its position. We decline to do so.

█ Defendant also argues that an instruction on facilitation as a lesser offense to accomplice liability was required based on *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). However, *Beck* only entitles a defendant to "instructions on any existing lesser included offenses ... supported by the evidence." *West,* 176 Ariz. at 443, 862 P.2d at 203. The evidence in this case does not permit consideration of any lesser offense. Defendant was either Amaral's accomplice to armed robbery and murder or was not guilty.

## E. Reasonable doubt instruction

Without objection, the judge gave the following instruction to the jury:

> The term "reasonable doubt" means doubt based upon reason. This does not mean an imaginary or possible doubt. It is a doubt which may arise after a careful and impartial consideration of all the evidence or from the lack of evidence.

Defendant claims that this instruction was error because a possible doubt can be reasonable if it is not imaginary.

In *State v. Portillo,* this court held that prior to January 1, 1996, there is no error, fundamental or otherwise, in the definition provided by the trial judge. 182 Ariz. 592, 898 P.2d 970 (1995).

## SENTENCING ISSUES

### A. Death eligibility

█ The trial court found that Defendant was a major participant in the underlying felonies of armed robbery and exhibited a reckless indifference to human life, making him death eligible for both murders. *See State v. Hyde,* 186 Ariz. 252, 286, 921 P.2d 655, 686 (1996); *West,* 176 Ariz. at 452, 862 P.2d at 212. The special verdict shows that the judge found the following factors relevant to Defendant's major participation: The robberies were premeditated, planned, and agreed on by Defendant and Amaral; Defendant furnished Amaral with the weapon used in the murders or knew Amaral had the weapon with him for the robberies; Defendant drove Amaral to the scene, waited while Amaral committed the robberies, picked up Amaral after the crime, witnessed the destruction of evidence, and failed to report the crimes. In determining that Defendant acted with a reckless indifference to human life, the judge not only considered the factors mentioned above but also found that Defendant had considerable experience with the justice system through his other felony convictions, was aware that Amaral had a violent and explosive temper, and failed to render aid knowing that one victim might not be dead. We agree with the judge's analysis of the facts and, on independent review, find beyond a reasonable doubt that the record supports Defendant's death eligibility.

█ Defendant claims two specific errors in the judge's findings. First, Defendant claims that because Amaral was an unbelievable witness, and the judge's analysis depended on Amaral's testimony, a finding of death eligibility is cruel and unusual punishment. We do not agree. First, on this record we defer to the jury and the judge regarding Amaral's credibility. Second, the finding need not hinge on Amaral's testimony because it is supported in a large degree by Defendant's own statements and circumstantial evidence. Third, the cases cited by Defendant are factually distinct and were decided several years prior to *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

█ Defendant next argues that the finding conflicts with the jury's verdict because, Defendant claims, "the jury acquitted Mr. Dickens of armed robbery of each victim, including accomplice armed robbery, and

found him guilty of only *un* armed robbery." This claim is premised on Defendant's incorrect interpretation of the verdict forms. There was no issue of unarmed robbery. Two victims were shot and killed during the robbery, and Defendant was either guilty as an accomplice to armed robbery or not guilty.

Despite the inconsistency in the verdict form, the jury was given the correct instructions on the armed robbery count, and both Defendant and Amaral testified that Amaral pulled the trigger. Thus, there was more than enough evidence to support the jury's finding that Defendant was an accomplice to and guilty of armed robbery and that, although Defendant did not use a dangerous weapon, Amaral did. Given these facts, there is no prejudice resulting from the inconsistency in the verdict form. Therefore, the judge's death eligibility findings are not inconsistent with the verdict.

## B. The death sentence and independent review

Having found Defendant death eligible, we must conduct an independent review of the aggravating and mitigating factors to determine whether the aggravators outweigh the mitigators so that death is the appropriate sentence. The state must prove the existence of aggravating factors beyond a reasonable doubt. The defendant must prove the existence of mitigating circumstances by a preponderance of the evidence. In addition, the defendant is not bound by the rules of evidence in admitting mitigating evidence. A.R.S. § 13–703(C).

### 1. Aggravating circumstances

### a. A.R.S. § 13–703(F)(5)—pecuniary gain

A sentence for first degree murder may be aggravated if it is committed "in expectation of the receipt ... of anything of pecuniary value." A.R.S. § 13–703(F)(5). The F(5) factor exists only if pecuniary gain was a motive for the murder and not merely its result. *State v. Smith,* 146 Ariz. 491, 503, 707 P.2d 289, 301 (1985). Here, the judge found that both murders were committed for pecuniary gain. This finding is well supported in the record and is not contested by

Defendant. However, Defendant claims that the aggravating circumstance of pecuniary gain is unconstitutional because it fails to narrow the sentencer's discretion in that it duplicates the element of the underlying crime of felony murder, predicated on armed robbery. This court has previously rejected this claim. *West,* 176 Ariz. 432, 862 P.2d 192. We do so again.

### b. A.R.S. § 13–703(F)(6)—cruelty

A defendant is death-eligible if the murder is committed in an especially heinous, cruel, or depraved manner. A.R.S. § 13–703(F)(6). The court need only find the presence of one of the three factors. *State v. Hill,* 174 Ariz. 313, 328, 848 P.2d 1375, 1390, *cert. denied,* 510 U.S. 898, 114 S.Ct. 268, 126 L.Ed.2d 219 (1993).

The term "cruel" refers to the suffering experienced by the victim, including mental suffering. *State v. Clabourne,* 142 Ariz. 335, 347, 690 P.2d 54, 66 (1984). The trial judge found that Bryan's murder was cruel and thus applied the (F)(6) aggravating factor to Defendant's sentence for Bryan's murder. Defendant claims that the aggravating circumstance of cruelty is unconstitutional as applied to him because he is not personally culpable for the murder of Bryan and thus did not inflict, intend, or foresee the cruelty Bryan experienced. *See Apelt,* 176 Ariz. at 376–77, 861 P.2d at 661–62.

We disagree. The murder was clearly cruel as our cases have defined it: Bryan was forced at gunpoint to turn over his wallet and was asked if he was ready to die. He was forced to witness the execution-style murder of his wife and was then himself shot in the back of the head. *See, e.g., State v. Ramirez,* 178 Ariz. 116, 129, 871 P.2d 237, 250, *cert. denied,* 513 U.S. 968, 115 S.Ct. 435, 130 L.Ed.2d 347 (1994). Because Bryan was not killed instantly, he suffered consciously for at least twenty minutes until he was found by the police deputy. He understood that he and his wife had been attacked and shot.

The evidence also establishes beyond a reasonable doubt that Defendant did, or should have, foreseen that a victim would so suffer. Defendant planned the murders,

provided transportation to the scene, and patiently waited several hours to choose a suitable victim or victims. Defendant was admittedly intimately familiar with Amaral's violent temper and impulsiveness, yet he provided Amaral with a gun, instructed him to rob, and told him not to leave any witnesses. Defendant must have known that one victim would necessarily witness the execution of the other. We therefore agree that the (F)(6) aggravating factor of cruelty exists beyond a reasonable doubt.

### c. A.R.S. § 13–703(F)(8)— multiple homicides

■■■ This section applies if "[t]he defendant has been convicted of one or more other homicides, as defined in § 13–1101, which were committed during the commission of the offense." The judge found this aggravating circumstance beyond a reasonable doubt based on the double homicide. Defendant claims that the multiple homicide aggravating circumstance is unconstitutional as applied to him because he did not know or foresee the existence of a second victim. His argument is meritless. A.R.S. § 13–703(F)(8) does not require any mental state. Moreover, Defendant saw at least two people get out of the car and instructed Amaral to leave no witnesses.

■■■ Defendant also claims that use of one homicide as an aggravating factor for the other violates the prohibitions against double jeopardy, due process, and cruel and unusual punishment. This court has previously rejected the argument that multiple homicides as an aggravator under A.R.S. § 13–703(F)(8) amounts to double counting. *See State v. Greenway*, 170 Ariz. 155, 167–68, 823 P.2d 22, 34–35 (1991). Once this aggravator is proved beyond a reasonable doubt, it applies to *each* first degree murder conviction. *Id.* We agree that the multiple homicides aggravating circumstance exists beyond a reasonable doubt.

### 2. Mitigating circumstances

Defendant raises numerous claims regarding mitigating circumstances, both statutory and non-statutory.

### a. Existence of statutory mitigators

■■■ Defendant claims the judge should have found as statutory mitigators his accomplice liability and minor participation, his inability to reasonably foresee conduct that would cause death, and his age, under A.R.S. § 13–703(G)(3) to (G)(5) respectively. As discussed above, even though Defendant was an accomplice, we believe he was a major participant in the crime. His claim that he could not foresee the grave risk of death in perpetrating the armed robberies is also without merit. Finally, Defendant fails to explain how his age of twenty-six is mitigating. Given his level of experience and intellect, we decline to give it mitigating weight. *See, e.g., West*, 176 Ariz. at 451, 862 P.2d at 211.

### b. Existence of non-statutory mitigators

At sentencing, Defendant offered a list of thirty-one non-statutory mitigators. The judge made the following findings: by a preponderance of the evidence, Defendant proved he had a troubled childhood and a somewhat dysfunctional family, has always had a loving and caring mother, and now has a supportive family. The judge found that although Defendant has exhibited some sympathy or remorse for the victims and their families, it was insufficient to call for leniency. The felony murder verdict was found to be a relevant mitigating circumstance, but it was offset by Defendant's major participation in the planning and execution of the crime. The judge found that Defendant's capacity to appreciate the wrongfulness of his conduct was not impaired at the time of the crime. The judge also refused to find that Amaral's life sentence was a significant mitigating factor. Although he did not specifically mention each of the thirty-one proffered mitigating factors, the judge stated that he considered and weighed all information offered in mitigation, and did not find it sufficiently substantial to call for leniency. Defendant challenges the judge's findings on these mitigators specifically and generally.

■■■ First, Defendant claims that the judge erred in not considering Amaral's life sentence as a non-statutory mitigator. This

court has stated that sentence disparity between co-defendants can be a mitigating factor. *State v. Schurz,* 176 Ariz. 46, 57, 859 P.2d 156, 167 (1993), *cert. denied,* 510 U.S. 1026, 114 S.Ct. 640, 126 L.Ed.2d 598 (1993). We also noted, however, that it is not the "mere disparity" that is significant but unexplained disparity. *Id.* Here, the disparity between the sentences is not unexplained. At the time of sentencing, Amaral was sixteen years old, and Defendant was twenty-six. Moreover, Amaral received a life sentence because of his plea agreement with the state. *See, e.g., State v. Gillies,* 135 Ariz. 500, 515, 662 P.2d 1007, 1022 (1983), *appeal after remand,* 142 Ariz. 564, 691 P.2d 655 (1984), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985). There was no error in refusing to give mitigating weight to Amaral's sentence.

■ Second, Defendant claims the judge failed to properly find or weigh other mitigating circumstances. Defendant fails to explain which mitigators should have been found or why they should have been found to exist. Moreover, it is within the court's discretion to determine how much weight to give each mitigator. *See State v. Brewer,* 170 Ariz. 486, 504, 826 P.2d 783, 801, *cert. denied,* 506 U.S. 872, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992). We find no abuse of discretion in the weight given to the factors, and our independent review of the record reaches the same result.

■ Defendant also claims that the special verdict was fatally lacking in specificity. We disagree. In *State v. Kiles,* this court stated that the trial judge "is required only to render a verdict containing findings sufficiently specific to enable" this court to make a meaningful review. 175 Ariz. 358, 368–69, 857 P.2d 1212, 1222–23 (1993), *cert. denied,* 510 U.S. 1058, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994). It is sufficient if the special verdict "resolves the material and relevant factual disputes raised by the evidence and tells what significant mitigating circumstances were found by and weighed by the judge." *Id.* The special verdict in this case adequately discussed the aggravating factors, the proffered mitigation, and the weighing process. The reasons underlying the judge's decision are clear and apparent in the verdict. No more is required.

### 3. The death penalty as cruel and unusual punishment

Defendant argues that because Amaral's testimony could not be sufficiently trusted, a death sentence based on Amaral's testimony is cruel and unusual punishment. Contrary to Defendant's characterization, the judge did not depend solely on Amaral's testimony for his findings. Nor do we. The physical evidence, along with Defendant's inconsistent statements to police, support the findings of pecuniary gain, multiple homicides, and cruelty beyond a reasonable doubt. This is not a case of lingering doubt.

## SUMMARY ISSUES

### A. Denial of proportionality review

This court rejected proportionality review in *State v. Salazar,* 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992), *cert. denied,* 509 U.S. 912, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1993). Nevertheless, Defendant claims that denial of proportionality review in his case violates the ex post facto clause because the crimes occurred before *Salazar,* when the substantive right of court-conducted proportionality review was in effect. However, Defendant provides no authority to support the proposition that proportionality review is a substantive right protected by the ex post facto clause.

### B. Constitutionality of Arizona's death penalty statute

The following issues raised by Defendant on the constitutionality of Arizona's death penalty statute have previously been rejected and are rejected again:

a. Judge sentencing violates equal protection. Rejected in *Landrigan,* 176 Ariz. at 6, 859 P.2d at 117.

b. Statute insufficiently channels sentencer's discretion. Rejected in *West,* 176 Ariz. at 454, 862 P.2d at 214.

c. Statute gives prosecutor unlimited discretion in seeking death. Rejected in *West,* 176 Ariz. at 454, 862 P.2d at 214.

d. Execution by lethal injection is cruel and unusual punishment. Rejected in *State v. Hinchey,* 181 Ariz. 307, 315, 890 P.2d 602, 610, *cert. denied,* —— U.S. ——, 116 S.Ct. 528, 133 L.Ed.2d 434 (1995); *accord LaGrand v. Lewis,* 883 F.Supp. 469 (D.Ariz.1995) (noting that every court to address this issue has upheld the constitutionality of execution by lethal injection).

e. Death sentence is discriminatorily applied against poor Caucasian males. Rejected in *West,* 176 Ariz. at 454, 862 P.2d 192.

f. Judge failed to establish appropriateness of death sentence. Rejected in *Walton v. Arizona,* 497 U.S. 639, 651–52, 110 S.Ct. 3047, 3056, 111 L.Ed.2d 511 (1990).

g. Judge is precluded from weighing mitigation evidence that does not meet the evidentiary standard but may otherwise give the sentencer reservations about the appropriateness of a death sentence. Rejected in *Walton,* 497 U.S. at 651–52, 110 S.Ct. at 3056.

h. Burden of proof is placed on the defendant. Rejected in *Atwood,* 171 Ariz. at 645 n. 21, 832 P.2d at 662 n. 21.

i. Defendant has a right to jury findings regarding sentencing factors. Rejected in *Walton,* 497 U.S. at 651–52, 110 S.Ct. at 3056.

j. The heinous, cruel, or depraved aggravator is unconstitutionally vague. Rejected in *State v. Vickers,* 159 Ariz. 532, 768 P.2d 1177 (1989), *cert. denied,* 497 U.S. 1033, 110 S.Ct. 3298, 111 L.Ed.2d 806 (1990).

## CROSS APPEAL

The state filed a cross appeal alleging that the trial judge erred in refusing to give a jury instruction on Defendant's flight or concealment. Because we have affirmed Defendant's convictions and death sentences, we do not reach the merits of this issue.

## CONCLUSION

We have searched the record for fundamental error and have found none.[8] Nor do any of the issues raised on appeal warrant reversal. Accordingly, we affirm Defendant's felony murder convictions and death

sentences. We also affirm Defendant's convictions for armed robbery and conspiracy to commit armed robbery and the sentences imposed.

ZLAKET, Vice Chief Justice, MOELLER and MARTONE, JJ., and DRUKE, Chief Judge.

Justice Robert J. CORCORAN (retired) did not participate in this decision; pursuant to Ariz. Const. art. 6, § 3, Chief Judge William E. Druke of the Court of Appeals, Division Two, was designated to sit in his stead.

---

8. The convictions in this capital case were appealed and briefed before the effective date of the repeal of A.R.S. § 13–4035. *See* 1995 Laws, ch. 198, § 1.