REINHARDT, Circuit Judge,
dissenting:
The majority opinion allows the State of Arizona to execute Dickens essentially for being the getaway driver in the armed robbery that resulted in the death of the Bernsteins. Yet Supreme Court case law is clear that imposition of the death penalty on one “who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed” is excessive punishment under the Eighth Amendment. Enmund v. Florida, 458 U.S. 782, 797, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). It is not disputed that Dickens did not kill, attempt to kill, or intend that the Bernsteins be killed. Under Enmund, his death sentence is therefore unconstitutional.
The majority attempts to escape the clear holding of Enmund by arguing that Dickens falls under the narrow exception *1074 created in Tison v. Arizona, in which the Supreme Court held that “major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement” and justifies the imposition of a death sentence on a defendant convicted of felony-murder. 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). Dickens, however, was neither a major participant in the commission of the robbery of the Bernsteins, nor was he recklessly indifferent to human life. In fact, nothing material distinguishes Dickens from Enmund, or any other individual who helped plan an armed robbery but whose principal role in the commission of the offense is that of a getaway driver. It is well established under Supreme Court law that the imposition of the death penalty on such a defendant is unconstitutional. The majority reaches the opposite conclusion, however, as the result of misconstruing the record, engaging in improper fact-finding, and relying on unreasonable findings of facts, facts that were not determined by the Arizona Supreme Court; even more important, the majority misconceives the clear import of the two controlling Supreme Court cases, albeit undoubtedly all in good faith.
Because the decision of the Arizona Supreme Court finding that Dickens was death eligible for the murder of the Bern-steins under Enmund and Tison “involved an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States,” and “was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,” 28 U.S.C. § 2254(d), I conclude that we are compelled to reverse the district court’s denial of habeas and to grant the writ.
I. Enmund/Tison
The majority, as did the Arizona Supreme Court, correctly identified the two controlling Supreme Court cases: Enmund and Tison. In Enmund, the Supreme Court held that it was unconstitutional to execute the defendant, who was the getaway driver for an armed robbery of a dwelling, for “two killings that he did not commit and had no intention of committing or causing,” namely, the murders of the victims of the robbery by his accomplices. Enmund, 458 U.S. at 801, 102 S.Ct. 3368. The court determined that such a punishment for felony-murder would meet neither the deterrent nor retributive goals of the death penalty. Id. at 798-801, 102 S.Ct. 3368. Five years later in Tison, the Supreme Court carved out a narrow exception to Enmund. Tison did not overrule Enmund, but rather clarified it by creating an explicit exception; the Court said that “major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement.” Tison, 481 U.S. at 158, 107 S.Ct. 1676.
More recently, in Kennedy v. Louisiana, the Supreme Court described the holdings in Enmund and Tison as follows:
[I]n Enmund v. Florida, 458 U.S. 782 [102 S.Ct. 3368, 73 L.Ed.2d 1140] (1982), the Court overturned the capital sentence of a defendant who aided and abetted a robbery during which a murder was committed but did not himself kill, attempt to kill, or intend that a killing would take place. On the other hand, in Tison v. Arizona, 481 U.S. 137 [107 S.Ct. 1676, 95 L.Ed.2d 127] (1987), the Court allowed the defendants’ death sentences to stand where they did not themselves kill the victims but their involvement in the events leading up to the murders was active, recklessly indifferent, and substantial.
*1075 554 U.S. 407, 421, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) (emphasis added).
With this legal framework in mind, I analyze the findings of the Arizona Supreme Court (and the separate findings of the majority) in support of their separate conclusions that Dickens satisfied the two requirements for imposition of the death penalty: (1) that he was a major participant in the robbery of the Bernsteins; and (2) that he acted with reckless indifference to human life.
II. Major Participant
The Arizona Supreme Court found that Dickens was a major participant in the robbery because:
The robberies were premeditated, planned, and agreed on by [Dickens] and Amaral; [Dickens] furnished Amaral with the weapon used in the murders or knew Amaral had the weapon with him for the robberies; [Dickens] drove Amaral to the scene, waited while Amaral committed the robberies, picked up Amaral after the crime, witnessed the destruction of evidence, and failed to report the crimes.
State v. Dickens, 187 Ariz. 1, 926 P.2d 468, 490 (1996) (in banc) (emphasis added). These findings rest on the role Dickens played in the plan or agreement to commit a robbery and on his role as a driver who witnessed but did not actively participate in the events leading up to the murders. This does nothing to distinguish Dickens from other getaway drivers, and does not show that his participation in the events leading up to the murder of the Bernsteins was “active” and “substantial.” See Kennedy, 554 U.S. at 421, 128 S.Ct. 2641.
First, the finding that the robbery was “premeditated, planned and agreed on” by Dickens and Amaral, Dickens, 926 P.2d at 490, does little to meaningfully distinguish Dickens from any other getaway driver who ordinarily plays a part in the planning of the armed robbery and then drives the car that contains the individuals who actually commit the robbery. The only getaway driver who would not play such a role would be the unwitting or coerced one, such as a driver who is hired to act as a chauffeur for the robbers or one who is blackmailed into doing so. If participating in the planning and serving the ordinary role of the member of the group who drives the car were sufficient to meet the Enmund and Tison requirements, then almost any participant in a felony would be a major participant. After all, most members of a group committing a robbery will ordinarily participate in the planning of the crime, even if they go on to perform only a minor role in the commission of the crime, such as acting as a look-out or getaway driver.
Second, the Arizona Supreme Court relied on the fact that Dickens “either furnished Amaral with the weapon used in the murders or knew Amaral had the weapon with him for the robberies.” Id. at 490 (emphasis added). It so described the facts in the death eligibility section of its opinion, surely a critical section in which petitioner and the federal courts are both entitled to expect accuracy and on which both are unquestionably entitled to rely. What the Arizona Supreme Court’s statement means is that while Dickens may have furnished Amaral with a gun, what is certain is that he knew that Amaral had a gun. A getaway driver or other participant in an armed robbery (again, except for an unwitting or coerced one) knows that at least one of his accomplices is armed. Knowledge of the fact that someone is armed does not, however, make the possessor of that knowledge a major participant. Moreover, possessing that knowledge is a passive rather than an active act. There is nothing inherent in knowing that an accomplice is armed that raises the level of participation to that of a *1076 major participant. This finding by the Arizona Supreme Court is essentially that Dickens was a knowing participant, but that is not the correct standard; Tison is a narrow exception that requires major participation, not mere knowledge.[1]
Third, the Arizona Supreme Court found that Dickens “drove Amaral to the scene, waited while Amaral committed the robberies, [and] picked up Amaral after the crime.” Id. at 490. The majority attempts to recast these findings so as to make them more inculpatory to Dickens, by describing those actions as “aiding Amaral’s escape,” “helping Amaral evade capture,” and “helping] Amaral flee the scene.” Maj. Op. at 1061-62, 1062-63. But these are the very functions of participating in a robbery as a getaway driver. These findings, even as recast by the majority, do nothing to distinguish Dickens’ actions from those of other getaway drivers. Enmund, who the Supreme Court found could not be sentenced to death, was “in the car by the side of the road at the time of the killings, waiting to help the robbers escape.” Enmund, 458 U.S. at 788, 102 S.Ct. 3368 (emphasis added).
Finally, the court found that Dickens “witnessed the destruction of evidence” and “failed to report the crime.” Dickens, 926 P.2d at 490. These findings are of a passive, rather than active, nature and do not establish that Dickens was a major participant in the underlying robbery. Nor do these findings do anything to distinguish Dickens from other getaway drivers, who may well help dispose of incriminating evidence and do what they can to cover up and prevent others from knowing of their own involvement in the crime.[2]
In sum, in finding that Dickens was a major participant, the court essentially found that he acted as the getaway driver for Amaral, and that he did nothing to stop the robbery before or after it was commit *1077 ted. But, the same could be said about Enmund or any other getaway driver, and the Supreme Court has clearly held that the death penalty is unconstitutional in these circumstances. Moreover, the same could be said about almost any participant in a felony-murder, major or minor. The facts simply do not support a finding that Dickens played an active and substantial role in the robbery that resulted in the death of the Bernsteins.
There is no basis for comparing Dickens, who helped plan a robbery, knew his accomplice was armed, and drove the getaway car, with the Tison brothers, the exception to the Enmund rule on which the majority seeks to rely. The Tison brothers “brought an arsenal of lethal weapons into the Arizona State Prison which [they] then handed over to two convicted murderers,” helped them escape from prison, “participated fully in the kidnaping and robbery” by flagging down the car on the road, robbing the family, driving the family into the desert, and holding them at gunpoint. Tison, 481 U.S. at 139-41, 151-52,107 S.Ct. 1676 (emphasis added). They knew that Gary Tison, their father, was “thinking about” killing the family, and “saw Greenawalt and their father brutally murder their four captives with repeated blasts from their shotguns.” Id. at 140-41, 107 S.Ct. 1676 (emphasis added). The Ti-son brothers played an active and substantial role in the commission of the crimes (as opposed to its planning), and were therefore major participants; Dickens, whose role was limited to that of getaway driver, was not. This is a crucial and dispositive distinction. The findings by the Arizona Supreme Court in Dickens undermine the Enmund and Tison standard that only major participants in the commission of the crime may be eligible for the death penalty, and is therefore an unreasonable application of clearly established Supreme Court law. The lack of any true distinguishing characteristics between Dickens and the typical getaway driver renders the analysis by the Arizona Supreme Court an unreasonable application of Enmund and Tison.
The majority, no doubt recognizing that the Arizona Supreme Court findings in support of the major participant determination describe nothing more than the typical getaway driver, adds additional findings to support its conclusion that Dickens was a major participant. The majority holds that Dickens was a major participant in the robbery of the Bernsteins because, in addition to the findings by the Arizona Supreme Court (sometimes as recast by the majority), he “stak[ed] out the crime scene,” “target[ed] the victims,” “watched Amaral shoot the victims,” and “continued in the criminal venture after the murders were committed.” Maj. Op. at 1061-62, 1062-63. Nowhere in its decision does the Arizona Supreme Court take into account these findings in its major participant determination.
Even considering these additional findings, however, the majority does not get far. Three of its additional findings, that Dickens staked out the crime scene, targeted the Bernsteins, and continued in the criminal venture, do little to distinguish Dickens from other getaway drivers who may, for example, scout the neighborhood and identify the mom and pop store to be robbed. Staking out the rest stop area and targeting the Bernsteins for the robbery go only to Dickens’ role in planning the robbery, not to any active participation in its commission. And every getaway driver, in some sense, continues in the criminal venture by driving the car away from the scene of the robbery. Doing so is the essence of being a getaway driver. But Dickens did not continue in the criminal venture in the way the Tison brothers did, by continuing to aid escaped murderers and participating in a crime spree, *1078 “ending in a gun battle with the police in the final showdown.” See Tison, 481 U.S. at 151, 107 S.Ct. 1676. Dickens drove the car away from the rest stop, and parted ways with Amaral two days later. In fact, Dickens refused to help Amaral use the credit card he had stolen from the Bern-steins. Despite its attempt to conjure up more support, the majority cannot distinguish Dickens from a typical getaway driver, and thus cannot establish that Dickens was a major participant in the underlying crime.
The fourth finding by the majority, that Dickens “watched Amaral shoot the victims,” is not only one that the Arizona Supreme Court did not take into account in its major participation determination; it is a finding that the Arizona Supreme Court did not make at all.[3] But rather than “take the facts as the Arizona Supreme Court has given them to us,” Tison, 481 U.S. at 151, 107 S.Ct. 1676, the majority decides to engage in de novo fact-finding, and unreasonable factfinding at that, as the finding that Dickens watched the murders is unsupported by the record. Before addressing why the finding is unreasonable, however, it is important to consider why the majority feels compelled to make this finding in the first place. Dickens correctly argues that his case is analogous to Enmund, and therefore his death sentence is unconstitutional, because he “was not present when the killing took place.” See Enmund, 458 U.S. at 795, 102 S.Ct. 3368. Like Enmund, he was parked in a car some distance from the scene of the murder, acting as the getaway driver. See id. at 784, 788, 102 S.Ct. 3368. The detectives who examined the crime scene and the surrounding area calculated that it took 2 minutes and 29 seconds to walk from where Dickens was parked to where the murders took place.[4]
The majority attempts to refute Dickens’ presence argument in two ways. First, the majority holds that “nowhere in Enmund or Tison does the Supreme Court clearly establish that ‘presence’ at a murder scene is a mandatory prerequisite for the death penalty.” Maj. Op. at 1062. To anyone who has read Enmund and Tison, however, there can be no question that the Supreme Court established that presence is a critical aspect in the analysis for death eligibility. In both Enmund and Tison, the Supreme Court stressed on sev *1079 eral occasions that Enmund, who was found not death eligible, had not been present at the time of the killings. See Enmund, 458 U.S. at 795, 102 S.Ct. 3368 (noting that “the defendant ... was not present when the killing took place”); Tison, 481 U.S. at 149, 107 S.Ct. 1676 (“At one pole was Enmund himself: the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.”) (emphasis added); id. at 158, 107 S.Ct. 1676 (noting that Enmund was “sitting in a car away from the actual scene of the murders”). In surveying states’ practices on imposing death sentences on those convicted of felony-murder, the Supreme Court in Enmund found that only 16 out of 739 death row inmates in the entire United States were not physically present at the scene of the crime, and only 3 of those inmates (including Enmund) were not physically present and had not “hired or solicited someone else to kill the victim or participated in a scheme designed to kill the victim.” Enmund, 458 U.S. at 795, 102 S.Ct. 3368; see also Tison, 481 U.S. at 148, 107 S.Ct. 1676 (“The Court [in Enmund ] found ... that only 3 of 739 death row inmates had been sentenced to death absent an intent to kill, physical presence, or direct participation in the fatal assault. ...”) (emphasis added).
In Tison, the Supreme Court repeatedly stressed the importance of presence. It noted the finding in Enmund that only 3 death row inmates in the entire United States were neither present at the scene nor involved in a scheme to murder. Id. at 148, 107 S.Ct. 1676. Moreover, the Supreme Court found a consensus among state courts that certain aggravated felony-murders merited the death penalty, as an exception to Enmund. Id. at 154-55, 107 S.Ct. 1676. In describing each of those cases, the Supreme Court specifically noted that the defendants were present at the scenes of the murders, contemplated killing, or used lethal force. Id. Moreover, in distinguishing the Tison brothers from Enmund, and justifying the death penalty for the former while not for the latter, the Supreme Court stated:
Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each [Tison brother] was actively involved in every element of the kidnaping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight.
Id. at 158, 107 S.Ct. 1676 (emphasis added). Even if presence is not a “mandatory prerequisite” to death eligibility, Maj. Op. at 1062, it is certainly a critical aspect of the inquiry under Enmund and Tison.
Second, perhaps acknowledging the weakness of its argument that presence is not a critical factor, the majority goes on to hold that “even if Tison and Enmund could be read to incorporate a mandatory ‘presence’ requirement, it seems that the Arizona Supreme Court suggested that Dickens met that requirement” because, the majority says, Dickens “watched each part of the Bernsteins’ murders as they unfolded.” Maj. Op. at 1062-63. According to the majority, “Dickens testified at trial that he ... (1) watched Amaral leave the truck with a loaded .38-caliber handgun, knowing Amaral was going to rob the Bernsteins at gunpoint; (2) watched Amaral walk across the highway; (3) observed Amaral moving the Bernsteins around the front of their car in the path of the illuminated headlamps; and (4) saw flashes as Amaral shot the victims in the head.” Maj. Op. at 1063.
The majority overstates the evidence in the record. Dickens testified that after Amaral left his truck, he “lost sight ... when he came up to the edge of the interstate” and then “heard one shot and one *1080 muzzle flash.” Dickens further testified that he saw a “shadow as they went in front of the lights,” like “a flicker of light.” The prosecution read into the record the following statement by Dickens:
I remember seeing, I think I seen, I guess it was three, three times I seen somebody pass in front of the lights. I seen the first person, then the second person, and then a few steps behind I seen Travis walk behind or in front of the light.
Moreover, Officer Johnson (the first officer on the scene) testified that it was difficult to see from where Dickens was parked across the highway to the other rest area where Amaral murdered the Bernsteins, in part because there was no lighting in either rest area. In fact, absent the car headlights, it was “pitch black.” Amaral also testified at trial that he did not see the moon on the night of the murders,[5] and that there were no street lights that shone into the rest area. This evidence does not support a finding that Dickens actually “watched each part of the Bernsteins’ murders as they unfolded.” Maj. Op. at 1063. Certainly not, as the majority suggests, in the same way that the Tison brothers watched the victims in that case being murdered. Dickens saw flickers of light, shadows, heard a gunshot, and saw a muzzle flash. The Tison brothers, in contrast, were at the scene of daylight murders and “they saw Greenawalt and their father brutally murder their four captives with repeated blasts from their shotguns.” Tison, 481 U.S. at 141, 107 S.Ct. 1676 (emphasis added). In any event, under no fair reading of the evidence can it be said that because Dickens could see part of the shooting of the Bernsteins he was present at the scene of the murders. To the contrary, he like Enmund was sitting in a parked ear, approximately the same distance away from the scene as Enmund.
The majority adds that Dickens was present at the scene of the murders because he “drove through the rest stop to pick Amaral up, and (to use his words)[6] verify “everything had been taken care of’ (i.e., verify the victims had been shot).” Maj. Op. at 1063. In reaching this finding, the majority goes beyond overstating the evidence; it completely misconstrues it or adds to it. No state court ever found as a fact that Dickens drove through the rest area. The “facts and procedural history” section of the Arizona Supreme Court decision put the facts in the light most favorable to the state. Dickens, 926 P.2d at 474-75. The court began that section with the statement “[according to Amaral’s testimony at trial.” Id. at 474. It did not, however, adopt some of those statements. For example, the court included “facts,” such as the use of the walkie-talkie and other parts of Amaral’s “testimony” that it deliberately did not rely on in its discussion of death eligibility under Enmund and Tison, and that the prosecution itself disavowed during the state proceedings as well as before this court. And yet, even in that “facts and procedural history” section, the Arizona Supreme Court made no mention of Dickens driving through the rest area. Rather, the court said that “[wjhile Amaral was with the Bernsteins, [Dickens] drove across the median to the westbound lanes, where he picked up Amaral.” Id. at 475 (emphasis added). Its major participant and reckless indifference discussion under Enmund and Tison also did not mention anything about Dickens driving through the rest area.[7]
*1081 Only one statement by the Arizona Supreme Court could possibly be interpreted as support for a finding (had one been made) that Dickens drove through the rest area, namely, that Dickens “failed to render aid even though he knew one victim might not be dead.” Id. at 490. If we overlook the fact that the Arizona Supreme Court did not specify any factual basis for this finding, and presume that it was making an inferential finding that Dickens drove through the rest stop and as a result of doing so knew that one victim might not be dead, then that finding clearly constitutes an unreasonable finding of fact, as it is unsupported by the evidence in the record. Amaral never stated in his testimony that he saw Dickens drive through the rest area or that Dickens did so. Amaral testified that “the only thing I can remember is he came and picked me up, I don’t know if he was leaving the interstate as far as leaving the rest stop or coming [from the interstate] into the lane going out of the rest stop.” Even after prompting as to whether he saw Dickens drive through the rest stop, Amaral said he did not remember Dickens driving through the rest stop. At trial, he further testified, “I still don’t remember him coming in as I’m going out. There was not enough time span where he left the other side to get across when I was running.” (emphasis added). Dickens, of course, also denied driving through the rest stop.
The only allegation that Amaral made with respect to this point, on which the majority could conceivably be thought to rely to support its own finding, see Maj. Op. at 1066-67 n. 13, was a belated half-sentence reference by Amaral to a conversation that Amaral said he had with Dickens sometime after the murders in which he “believe[d]” Dickens said that he went through the rest stop. Neither the Arizona Supreme Court nor the trial court ever mentioned that purported conversation. Neither court deemed the belated statement credible or worthy of mention. In the end, this half-sentence, the only possible “evidence” regarding Dickens driving through the rest stop, is mentioned only by the majority here but not by any state court. Moreover, that “evidence” is contrary to what Amaral himself observed, and contrary to what Amaral testified to regarding the lack of time for Dickens to drive through the rest stop before picking him up on the side of the road. Reliance on the isolated half-sentence about what Amaral “believe[d]” Dickens had said to support a finding (itself non-existent) that Dickens drove through the rest stop would in any event have been “based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d). In short, there is no basis for any finding that Dickens drove through the rest stop and even more important ,no finding was made by any state court.
In sum, the Arizona Supreme Court found that Dickens planned a robbery with Amaral, knew Amaral was armed, acted as the getaway driver, and witnessed the destruction of evidence. That, according to the court, made him a major participant in the robbery of the Bernsteins. It is evident under Enmund and Tison, however, that these findings are far from sufficient. In reaching a contrary result, the Arizona Supreme Court engages in an unreasonable application of Enmund and Tison. The record is clear: Dickens, like Enmund, acted as a getaway driver, and “was not present when the killing took place.” Enmund, 458 U.S. at 795, 102 S.Ct. 3368. Instead, like Enmund, Dickens was “sitting in a car away from the actual scene of the murders.” Tison, 481 U.S. at 158, 107 S.Ct. 1676. Dickens’ participation in the commission of the crime can be described in the same way the Supreme Court de *1082 scribed the participation of the defendant in Enmund: he was a “minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.” Id. at 149, 107 S.Ct. 1676. Although Dickens helped plan the robbery, like Enmund, he was not a major participant in the commission of the crime itself. “Putting [him] to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts.” Enmund, 458 U.S. at 801, 102 S.Ct. 3368. Nor does it serve any deterrent purpose. Id. at 798-99, 102 S.Ct. 3368. The Arizona Supreme Court decision to the contrary “involved an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court of the United States.” See 28 U.S.C. § 2254(d).
In short, Dickens clearly does not meet the major participant requirement necessary for a determination of death eligibility under Enmund/Tison. The Arizona Supreme Court’s contrary ruling is an unreasonable application of established Supreme Court law.
III. Reckless Indifference
Even if Dickens were a major participant in the underlying robbery, the evidence does not support a finding that he satisfied the second requisite element necessary to make him death eligible: reckless indifference to human life. In Tison, the Supreme Court established a standard for reckless indifference to the value of human life that was not quite intent to kill, but was more than mere foreseeability: reckless indifference means “knowingly engaging in criminal activities known to carry a grave risk of death.” Tison, 481 U.S. at 157, 107 S.Ct. 1676. The Supreme Court gave some examples of those who exhibit “reckless indifference to the value of human life”: individuals it described as “among the most dangerous and inhumane of all” murderers. Id. They include “the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim.” Id. Dickens, the getaway driver in a robbery, clearly is not “among the most dangerous or inhumane of all” murderers.
Here, the Arizona Supreme Court found that Dickens acted with reckless indifference to human life because, in addition to the fact that he was a major participant, he “had considerable experience with the justice system through his other felony convictions, was aware that Amaral had a violent and explosive temper, and failed to render aid knowing that one victim might not be dead.” Dickens, 926 P.2d at 490. The majority concludes that, given these facts as determined by the Arizona Supreme Court, the “conclusion that Dickens exhibited a reckless indifference to human life was not objectively unreasonable.” Maj. Op. at 1064. Here, too, the majority is clearly wrong. The Arizona Supreme Court conclusion constitutes an unreasonable application of established Supreme Court law and is based on an unreasonable determination of the facts.
The majority first erroneously rejects the argument that armed robbery is not a crime known to carry a great risk of death, as the Supreme Court required for a finding of reckless indifference. See Tison, 481 U.S. at 157, 107 S.Ct. 1676. In Tison, the Supreme Court noted that there are some crimes for which “any major participant necessarily exhibits reckless indifference to the value of human life.” Id. at 158 n. 12, 107 S.Ct. 1676. The Supreme Court expressly did not include armed robbery in that class of crimes, however. Instead, it remanded for the state courts to *1083 determine whether the Tison brothers, convicted of armed robbery and kidnapping, had acted with reckless indifference. Id. at 156-58, 107 S.Ct. 1676. In Enmund, moreover, the Supreme Court held that its analysis of whether Enmund acted with a sufficiently culpable mental state would be very different “if the likelihood of a killing in the course of a robbery were so substantial that one should share the blame for the killing if he somehow participated in the felony.” Enmund, 458 U.S. at 799, 102 S.Ct. 3368. The Supreme Court held that the kind of crime that Enmund (and Dickens) committed — armed robbery — was not one in which “death so frequently occurs.” Id. at 799-800, 102 S.Ct. 3368. It cited the Uniform Crime Report to note that “only about 0.43% of robberies in the United States in 1980 resulted in homicide.” Id. at 800 n. 24, 102 S.Ct. 3368. Looking at that same data source, in 2010, the last year for which full statistics are available, there were 367,832 robberies, and 780 murders in connections with robberies.[8] Thus, the number of murders in connection with robberies as a percentage of total robberies has actually been cut in half since Enmund was decided, from 0.43% to 0.21%. In holding that “Dickens failed to cite any U.S. Supreme Court precedent, and we know of none, clearly estabhshing” the principle that armed robbery is not the type of crime “known to carry a grave risk of death,” Maj. Op. at 1064, the majority simply fails to honor the analysis in Tison and Enmund. The clear import of those cases is that mere participation in an armed robbery is not enough to establish that a defendant acted with reckless indifference to human life.
Still, the question remains whether under the facts of this case, as determined by the Arizona Supreme Court, a finding that Dickens acted with reckless indifference to human life is reasonable. The answer is, without doubt, no. First, the Arizona Supreme Court found that Dickens had “considerable experience with the justice system through his other felony convictions.” Dickens, 926 P.2d at 490. Notably, the majority fails to discuss how this fact supports a finding of acting with reckless indifference. It was wise to do so, because convictions for forgery and lewd and lascivious acts with a child under 14 years of age, the crimes for which Dickens had been convicted, do nothing to establish that he “knowingly engag[ed] in criminal activities known to carry a grave risk of death.” Tison, 481 U.S. at 157, 107 S.Ct. 1676.
Second, the Arizona Supreme Court found that Dickens was “aware that Amaral had a violent and explosive temper.” Dickens, 926 P.2d at 490. The majority relies heavily on this “fact” in its reckless indifference analysis, ultimately concluding that “Dickens ‘could have foreseen that lethal force might be used’ in the course of the robbery.” Maj. Op. at 1064 (quoting Tison, 481 U.S. at 151-52, 107 S.Ct. 1676). The Supreme Court held in Tison, however, that foreseeability could not be the test for reckless indifference. In fact, the Supreme Court noted that “[p]articipants in violent felonies like armed robberies can frequently anticipate that lethal force might be used in accomplishing the underlying felony.” Tison, 481 U.S. at 150-51, 107 S.Ct. 1676 (emphasis added) (internal quotation marks, alterations and ellipses omitted). “Enmund himself may well have *1084 so anticipated.” Id. at 151, 107 S.Ct. 1676. “[T]he possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and foreseen.” Id. If foreseeability were the test for death penalty eligibility, then that test would be reduced to “little more than a restatement of the felony-murder rule itself.” Id. Thus, the holding by the majority that Dickens could foresee the use of lethal force is insufficient and cannot support the proposition for which it is advanced.
Finally, the Arizona Supreme Court found that Dickens “failed to render aid even though he knew one victim might not be dead.” Dickens, 926 P.2d at 490. First, for the reasons stated in the previous section of this dissent, if the Arizona Supreme Court was making an inferential finding sub silentio that Dickens drove through the rest stop and as a result of doing so affirmatively knew that one victim might not be dead, then the evidence in the record simply does not support such a finding. Of course, if Dickens did not drive through the rest area, then there is no factual basis whatsoever in the record to support a finding that he knew that one victim might be alive. Without any facts to support a finding, and the only facts in the record being to the contrary, the finding that Dickens knew that one victim might still be alive and that he was recklessly indifferent in failing to stop and render aid is “based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d).[9]
Next, as the state in effect conceded at oral argument, the simple failure to go through the rest stop and check the victims to make sure they were not alive would not constitute reckless indifference. Otherwise, any getaway driver would be recklessly indifferent if he fulfilled his role and drove away from the scene of the crime without first checking to determine whether all possible victims of a shooting in the course of a robbery were dead. It is clear that getaway drivers are not per se death eligible because Enmund was not death eligible, and the Tison Court repeatedly made clear that the death eligibility rules are not merely restatements of the felony-murder rule. Tison, 481 U.S. at 151, 107 S.Ct. 1676.
There is simply no factual support whatsoever for any finding that Dickens drove through the rest area to see that both victims were dead and then drove on, leaving a still living victim, knowing that the victim might still be alive. Nor, of course, according to the record, was there any other reason Dickens might have driven through the rest stop while helping Amaral make his escape. And *1085 even if we overlooked all the contrary facts and nevertheless concluded that Dickens did drive through the rest stop in order to see that the victims were dead, then it is illogical, irrational and unreasonable to say that he knew one victim might be alive and drove on, leaving the victim in a seriously wounded state. If Dickens took the time to drive through the rest stop right after the murders to make certain both victims were dead, and he thought that one of the victims was still living, in that unlikely instance, he most certainly would have done something to ensure that the living victim failed to survive rather than driving on satisfied with the knowledge that one victim might still be alive. Thus, even considering the state’s whole range of factually unsupported possibilities, the only reasonable conclusion is that Dickens drove off without entering the rest stop area or without knowing the fate of the victims or at most drove off believing that both were dead, not that one victim might still be alive. Accordingly, the wholly factually unsupported rest stop drive through theory cannot support the conclusion that Dickens’ conduct demonstrated reckless indifference to human life.[10]
In addition to the findings by the Arizona Supreme Court in connection "with the reckless indifference determination, the majority improperly relies on the findings of the state trial court to support its conclusion that Dickens acted with reckless indifference fo human life, including findings that Amaral had beaten up a nurse, had a long history of carrying guns, twice threatened Dickens by pointing the gun at his head, and bragged about being involved in other murders. Maj. Op. at 1064-65. Nowhere does the Arizona Supreme Court refer to any of these findings, including in its reckless indifference determination. And, as I noted above, it is well established that “we look to the last reasoned state-court decision.” Lopez, 630 F.3d at 1202 (internal quotation marks and citation omitted). Even if the Arizona Supreme Court had adopted those findings, they would not support the conclusion that Dickens knew that there was “a grave risk of death” or that the “natural” result of the robbery would be the death of the Bernsteins. Tison, 481 U.S. at 157-58, 107 S.Ct. 1676 (emphasis added). Anger control problems in no way indicate that an individual will engage in murder. Nor does having beaten someone up on one occasion suggest that the individual will commit a murder. Carrying a gun, which is a Second Amendment right, also cannot legally lead to a finding that the individual is likely to murder someone; if it could, half or even more of the people in some of our states would qualify as likely murderers. While the trial court noted that Amaral had bragged to Dickens about committing other murders, it did not find that Dickens believed this statement, and it is clear that, as Dickens testified, he didn’t. In fact, as Dickens testified, when Amaral was first brought to Oak Grove Dickens was told that Amaral was a “chronic liar” with some “wild stories.” The trial court also noted that Amaral had scared Dickens by pointing a gun at him “a day or two prior to the murders.” (emphasis added). Pointing a gun and not *1086 shooting someone is a far cry from being a likely murderer. Even if these additional facts did suggest that Dickens could anticipate or foresee the possibility of violence, they do not suggest that Dickens knowingly engaged in criminal activity known to carry a grave risk of death. As noted above, the Supreme Court has rejected foreseeability as the test for reckless indifference because such test would amount to “little more than a restatement of the felony-murder rule itself.” Tison, 481 U.S. at 151, 107 S.Ct. 1676.
* * *
In sum, the Arizona Supreme Court found that Dickens acted with reckless indifference to human life because he was a major participant in the robbery of the Bernsteins, had prior felony convictions for forgery and lewd and lascivious acts with a child under 14 years of age, knew that Amaral had a violent and explosive temper, and “failed to render aid knowing that one victim might not be dead.” Dickens, 926 P.2d at 490. These findings, as I have explained above, “involved an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States” in Enmund and Tison, and are “based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,” 28 U.S.C. § 2254(d).
The Supreme Court made clear in Tison that the reckless indifference standard helps to “definitively distinguish[ ] the most culpable and dangerous of murderers.” Id. at 157, 107 S.Ct. 1676. Dickens is certainly neither. Even given the gruesome facts in Tison, the Supreme Court did not find that the brothers had been recklessly indifferent. Rather, it sent the case back to the state courts to make that determination, and the Tison brothers ultimately received life sentences. Dickens did not act with the “highly culpable mental state” required to establish death eligibility under Enmund and Tison, see id. at 157-58, 107 S.Ct. 1676, and certainly not because the individual with whom he planned the armed robbery was a young man who he knew had an anger problem.
IV. Conclusion
For the reasons set out above, the Arizona Supreme Court determination that Dickens was a major participant in the robbery of the Bernsteins and acted with reckless indifference to human life “involved an unreasonable application” of the Supreme Court decisions in Enmund and Tison, and “was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d). Dickens was the getaway driver to an armed robbery, did not play an “active” and “substantial” role in the commission of the underlying crime, see Kennedy, 554 U.S. at 421, 128 S.Ct. 2641, and was not present at the scene when Amaral shot the Bern-steins. Nor did Dickens “knowingly en-gag[e] in criminal activities known to carry a grave risk of death” simply because he was a participant in an armed robbery. Tison, 481 U.S. at 157, 107 S.Ct. 1676. The majority reaches the contrary result only by misconstruing the record and engaging in improper and unreasonable fact-finding. It is clear, however, that Dickens is not one of the “most culpable and dangerous of murderers” such that he should be put to death by the State of Arizona.
Because the Arizona Supreme Court’s decision that Dickens was a major participant in the armed robbery and that he acted with reckless indifference constitutes an unreasonable application of established Supreme Court law and is based on an unreasonable determination of the facts in *1087 the record, I dissent from the denial of the writ.[11]

. The majority makes inconsistent representations regarding whether Dickens furnished Amaral with a weapon: At times it states that Dickens was responsible for "arming Amaral with a handgun.” Maj. Op. at 1061-62, 1064. At other times, however, the majority recognizes that Dickens either provided the handgun or knew Amaral had the handgun, as was stated by the Arizona Supreme Court in the death eligibility section of its opinion. Maj. Op. at 1061-62, 1064-65. The reason for its inconsistency is apparent. The Arizona Supreme Court itself makes an inconsistent statement that led to the majority's own inconsistencies. It is, however, the Arizona Supreme Court’s former statement, not the latter, that should control our analysis. This is, after all, a death penalty case. To base our decision (even partially) to uphold the execution of a petitioner who did not actively participate in a murder on one of two inconsistent statements by a state court, simply because that one supports the death penalty and the other does not falls far short of fulfilling our obligations to the law and the Constitution. The Arizona Supreme Court expressly did not make a finding one way or the other as to whether Dickens furnished Amaral with a weapon, and it is not for this court to do so.

. The majority again attempts to recast the findings of the Arizona Supreme Court, writing that Dickens participated in "destroying evidence” or "assisted in the destruction of evidence,” Maj. Op. at 1061-62, 1062-63, rather than merely "witnessed the destruction of evidence.” The Arizona Supreme Court never made any finding that Dickens was in any way involved in the destruction of evidence in this case. In describing the facts in the light most favorable to the prosecution, the Arizona Supreme Court wrote: "Amaral removed cash, traveler’s checks, and one credit card from Bryan's wallet, then burned the wallet and its remaining contents.” Dickens, 926 P.2d at 475 (emphasis added). This recitation of facts, notably, was "[a]ccording to Amaral’s testimony at trial,” id. at 474, so even under that version of events, it was Amaral, not Dickens, who destroyed the evidence. In any event, even if Dickens had been a participant, rather than a mere witness, in the destruction of evidence, this does nothing to distinguish him from the typical getaway driver, as explained above.

. The trial court, in its death eligibility determination, made a finding that Dickens "witnessed the shootings.” It is well established, however, that "[i]n conducting review of a state court decision, we look to the last reasoned state-court decision.” Lopez v. Ryan, 630 F.3d 1198, 1202 (9th Cir.2011) (internal quotation marks and citation omitted). We must therefore look only to the Arizona Supreme Court decision, which did not make this finding. Further, even if we were to consider the trial court decision, the trial court did not make the broad finding the majority makes here that Dickens actually "witnessed Amaral shoot the victims,” in the sense that the majority implies. Dickens did, as explained below, witness the shootings in that he heard the gunshot and saw a muzzle flash. But he did not, and the record is clear on this, actually see Amaral shooting the Bernsteins in the head.

. The Federal Highway Administration, which establishes the speed for stop lights at crosswalks, sets the standard crossing time at 3.5 feet per second for pedestrian crosswalks. See U.S. Department of Transportation, Federal Highway Administration, Manual on Uniform Traffic Control Devices (2009), Ch. 4N, In-Roadway Lights, http://mutcd.fhwa.dot. gov/pdfs/2009/part4.pdf (Dec.2009). The detectives who measured the distance in this case said they were walking "at a normal walking pace.” Assuming a walking speed above that set by the Federal Highway Administration, at 4 feet per second, the average person walks 596 feet, or 199 yards, in 2 minutes and 29 seconds. Enmund was 200 yards away from the scene of the murders, Enmund, 458 U.S. at 784, 102 S.Ct. 3368, and the Supreme Court held that he was not present at the scene. Id. at 795, 102 S.Ct. 3368. Neither, therefore, was Dickens.

. The sun set at 6:52 P.M. that night, and the murders occurred around 9:17 P.M.

. By “his words” the majority means what Amaral testified to at trial about a conversation that he “believe[d]” he had with Dickens. I discuss the unreasonable reliance on this testimony infra at pages 1081-82.

.Incidentally, neither did the state trial court decision make any mention of Dickens driving through the rest stop.

. See Uniform Crime Report, 2010, Crime in the United States, tbl. 1, http://www.fbi.gov/ about-us/cjis/ucr/crime-in-the-u.s/2010/ crime-in-theu.s.-2010/tables/l OtblO 1 .xls (last visited Jan. 11, 2012); Expanded Homicide Data, tbl. 12, http://www.fbi.gov/about-us/cjis/ ucr/crime-m-the-u.s/2010/crime-in-the-u.s2010/tables/10shrtbll2.xls (last visited Jan. 11, 2012).

. Apparently recognizing that the finding by the Arizona Supreme Court that Dickens knew Bryan Bernstein might still be alive is indefensible, the majority instead holds that "the Arizona Supreme Court did not ‘base’ its decision” on that finding and that it was "not a dispositive factor in th[e] determination” that Dickens was recklessly indifferent. Maj. Op. at 1066-67 (emphasis added). It does so by deciding, without explanation, that the critical factor was not that Dickens knew that one victim might be alive, but rather that he "watched Amaral shoot the Bernsteins, but decided to aid Amaral over the Bernsteins.” Maj. Op. at 1066. The majority is clearly wrong. The Arizona Supreme Court did not find that Dickens was recklessly indifferent because he "failed to render aid” to the Bern-steins and instead aided Amaral. See Dickens, 926 P.2d at 490. In fact, the Arizona Supreme Court did not mention Dickens’ decision to aid Amaral at all in its reckless indifference discussion. Instead, the Arizona Supreme Court made an explicit finding, albeit an unreasonable one, that Dickens failed to aid the Bernsteins knowing that one victim might be alive. See id. It clearly relied on that finding to determine beyond a reasonable doubt that Dickens acted with reckless indifference to human life.

. There is no other suggestion in the record that Dickens somehow became aware of the physical condition of either of the Bernsteins. Nor do I read the Arizona Supreme Court decision as holding that a getaway driver who does not abandon his assignment to help the perpetrator or perpetrators of a robbery flee the scene so that he may determine the physical state of the victim or victims of a shooting that occurs during an armed robbery, and provide medical aid when desirable to the victims, has demonstrated reckless indifference to human life such that he has become one of the "most dangerous and inhumane of all” murderers. Such would be a remarkable ruling indeed.

. Because I would grant habeas relief on the Enmund and Tison claim, I would not reach any of the other issues the majority decides in the opinion or in the accompanying memorandum disposition that relate to the imposition of the death penalty.